IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FOREST GUARDIANS,

      Plaintiff,

 v.                                    No. CIV-00-490 JP/RHS&
                                           No. CIV-00-1240 JP/RHS
                                         (Consolidated)

UNITED STATES FOREST SERVICE, et al.,

      Defendants.

_____

SACRAMENTO GRAZING ASSOCIATION., et al.,

      Plaintiffs,

 v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

      This is a consolidated appeal from administrative action taken by two federal agencies, the

United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service

("FWS"), regarding the issuance and administration of a ten-year term grazing permit, issued on

November 23, 1999 ("the 1999 permit"), for the Sacramento Allotment, a grazing allotment in the

Lincoln National Forest.  The Sacramento Allotment contains prime nesting and roosting habitat

for the Mexican Spotted Owl ("MSO"), a threatened species listed under the Endangered Species

Act ("ESA"), 16 U.S.C. § 1531 *et seq.*

The first appeal is brought by Plaintiff Forest Guardians, a conservation organization, against the Forest Service, the FWS, and various agency officials sued in their official capacities. Forest Guardians seeks to stop alleged overgrazing on the Sacramento Allotment, which the Forest Guardians claims harms the MSO.  Two parties with interests in the Sacramento Allotment were allowed to intervene:  the Sacramento Grazing Association ("the SGA"), a general partnership engaged in the business of cattle ranching on the Sacramento Allotment, and Otero County, the county in which the Sacramento Allotment is located.

On April 6, 2000, when Forest Guardians' original complaint was filed, Forest Guardians primarily challenged the Forest Service's  issuance of the 1999 grazing permit to the SGA, which allowed the SGA to graze up to 553 cattle for ten years on the Sacramento Allotment.  Forest Guardians alleged that the Forest Service's approval of ongoing grazing on the Sacramento Allotment violated the ESA's consultation requirement, 16 U.S.C. § 1536, the National Forest Management Act's ("NFMA") consistency requirement, 16 U.S.C. § 1604(i), and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 706(1)-(2)(A).  After the Forest Service issued a biological assessment on November 1, 2000, determining that grazing on the Sacramento Allotment was not likely to adversely affect the MSO, the FWS, on February 2, 2001, concurred with the Forest Service's conclusion.  In response to the concurrence, Forest Guardians requested and was granted leave to file a First Amended Complaint, which added a claim against the FWS. Forest Guardians asserted that the FWS's concurrence violated the ESA, 16 U.S.C. § 1536, and was arbitrary, capricious, or otherwise not in accordance with law, 5 U.S.C. § 706.

The second appeal was brought by the SGA against the Department of Agriculture, the Forest Service, the Game Commission of the State of New Mexico, and various agency officials

2

sued in their official capacities.  The SGA seeks judicial review of administrative decisions made

by the Forest Service regarding the administration of the SGA's 1999 grazing permit.  First, the

SGA attacks a decision by the Forest Service allegedly to exclude from the Sacramento Allotment

the Dry and Davis Allotments, two smaller allotments that at one time were managed in

conjunction with the Sacramento Allotment.  Second, the SGA claims that the Forest Service

violated the SGA's due process rights and acted arbitrarily, capriciously, and not in accordance

with law when the Forest Service ordered the SGA to reduce its herd of cattle on three separate

occasions.  Finally, the SGA asserts that the Court should order the reduction in the number of elk

maintained by the New Mexico Game Commission on the Sacramento Allotment, should the

Court find a violation of the ESA or NFMA.

The parties submitted detailed legal memoranda on the merits of Forest Guardians' and

the SGA's claims.  This Court has thoroughly considered the documents in the administrative

record, all the parties' briefs and arguments, and the relevant case law.  As to Forest Guardians'

suit, this Court finds that the Forest Service and FWS violated the ESA's consultation

requirement and that the Forest Service violated the NFMA's consistency requirement.  In regard

to the SGA's appeal, this Court determines that the SGA's challenge to the alleged exclusion of

the Dry and Davis Allotments from the Sacramento Allotment is moot, as the Forest Service

ultimately considered the Dry and Davis Allotments as part of the Sacramento Allotment.

Moreover, the SGA's appeal from the Forest Service's decision prohibiting the SGA from grazing

the Dry and Davis Allotments until the completion of the National Environmental Policy Act

("NEPA") analysis is unripe for judicial review.  Additionally, this Court affirms the Forest

Service's three decisions to reduce the number of cattle allowed to graze on the Sacramento

3

Allotment and rejects the SGA's request to order a reduction in elk numbers on the Sacramento Allotment.

I.       **Legal Background**

A.       **Endangered Species Act**

In 1973, Congress enacted the ESA in order to conserve endangered and threatened species and the ecosystems on which they depend.  16 U.S.C. § 1531.  The Supreme Court stated that "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  TVA v. Hill, 437 U.S. 153, 184 (1978).  To carry out this purpose, the ESA has both substantive and procedural provisions.  Substantively, Section 7 of the ESA prohibits a federal agency from taking any action that jeopardizes the continued existence of any threatened or endangered species.  16 U.S.C. § 1536(a)(2).  Procedurally, an agency proposing to take an action must inquire of the FWS whether any threatened or endangered species "may be present" in the area of the proposed action.  16 U.S.C. § 1536(c)(1); Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir. 1985).  If an endangered or threatened species is present, the agency must conduct a biological assessment ("BA") to evaluate whether the species "is likely to be affected" by the action.  Id.  The BA is used to determine whether formal consultation is necessary.  50 C.F.R. § 402.12(a).  If the BA indicates that no listed species "are likely to be adversely affected" by the agency's action, and the FWS concurs with the findings of the BA, then formal consultation is not required.  50 C.F.R. § 402.12(j)-(k).

On the other hand, if the agency determines that the action "is likely to adversely affect" a listed species or if the FWS does not concur in a finding of "not likely to adversely affect" the listed species, the agency and the FWS must engage in formal consultation, which requires the

FWS to formulate a biological opinion ("BO") to determine whether the action "is likely to

jeopardize the continued existence" of the listed species.  See 50 C.F.R. § 402.14; Thomas, 753

F.2d at 763.  If the BO concludes that the action would jeopardize the species, then the action

may not go forward unless the FWS can suggest reasonable and prudent alternatives that avoid

jeopardy.  Thomas, 753 F.2d at 763.

When engaging in Section 7 consultation, the agency must use the "best scientific and

commercial data available."  16 U.S.C. § 1536(a)(2).  Moreover, while consultation is ongoing,

Section 7(d) prohibits a federal agency from making any "irreversible or irretrievable commitment

of resources . . . which has the effect of foreclosing formulation or implementation of any

reasonable and prudent alternative measures" to the agency action.  16 U.S.C. § 1536(d).

Section 7(d)'s prohibition remains in force until the agency's consultation duties are satisfied.  50

C.F.R. § 402.09.

B.    **National Forest Management Act**

The National Forest Management Act ("NFMA") requires the Forest Service to develop

land and resource management plans ("forest plans") in accordance with the principles of the

Multiple-Use and Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531.  See 16 U.S.C. § 1604.

The Forest Service is directed to manage the lands in the National Forest System in coordination

with "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness."  16 U.S.C.

§ 1604(e)(1).

Under the NFMA, forest management occurs at two levels.  Colorado Environmental

Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).  At the first level, the Forest

Service must develop a forest plan, prepare an accompanying environmental impact statement,

5

and facilitate a public review process conducted in accordance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 *et seq*.  See 16 U.S.C. § 1604; Lamb v. Thompson, 265 F.3d 1038, 1042 (10th Cir. 2001); Dombeck, 185 F.3d at 1167-68.  Forest plans are broad, programmatic documents that establish goals and guidelines for individual units of the National Forest System.  See 16 U.S.C. § 1604(g).  Forest plans may "be amended in any manner whatsoever" as conditions change and remain in effect for periods of 10 to 15 years.  16 U.S.C. § 1604(f).  At the second level of management, the Forest Service must implement the forest plans by approving or disapproving specific projects.  Id.  Proposed projects must be consistent with the governing forest plan and are subject to NEPA review.  16 U.S.C. § 1604(i); Lamb, 265 F.3d at 1042; Dombeck, 185 F.3d at 1168.  This consistency requirement also extends to the issuance and use of grazing permits on National Forest System lands.  See 36 C.F.R. § 222.2(c).

The Forest Service regulates site-specific livestock grazing through 10-year term grazing permits and Allotment Management Plans ("AMPs").  36 C.F.R. § 222.2-222.3.  The term grazing permits provide general information such as the number of livestock the permit holder is permitted to graze on the allotment, the time of year the livestock are permitted to graze on the allotment, and the duration of the permit.  See 36 C.F.R. § 222.3.  AMPs become part of the permit and set forth more specific objectives, management requirements, needed improvements, and monitoring evaluation standards for an allotment.  See 36 C.F.R. § 222.1(b)(2); 36 C.F.R. § 222.2.  AMPs must also be consistent with the governing forest plan.  Id. § 222.2.

To implement a term grazing permit, ongoing livestock grazing operations are monitored and adjusted within the scope of the permit and the AMP through issuance of an Annual

Operating Plan ("AOP") or Annual Operating Instructions ("AOIs").[1]  The AOIs are distinct from

the AMP because the AOIs offer yearly guidance to the permittee based on the range and

resource conditions for that year.  AOIs should "specify dates and areas of use, utilization

standards, maintenance and construction responsibilities for the year."  Fed. Defs. Resp. (Doc.

No. 213), Attachment 2 at 1 (Forest Service Handbook § 2209.13(19)).

## II.    Factual Background

### A.    The Sacramento, Dry, and Davis Allotments

The Sacramento Allotment consists of approximately 111,000 acres of Forest Service

lands on the Lincoln National Forest in New Mexico.  AR 10 at 6.[2]  Of these 111,000 acres, only

about 28,400 acres are grazed.  Id.  The remaining 82,600 acres are not grazed due to extreme

topography, excessive canopy cover of woody species, or limited forage to sustain grazing.  Id.[3]

The Sacramento Allotment was made into a single permit by the consolidation of twelve

smaller allotments held by the High Nogal Ranch, Inc. ("High Nogal") in the 1970s.  Id. at 2.

_____

[1]The terms "Annual Operating Plan" and "Annual Operating Instructions" are synonymous.  To avoid confusion, for purposes of this Memorandum Opinion and Order, this Court will use the term "Annual Operating Instructions," or "AOIs."

[2]There are four separate administrative records in this case.  This Court will refer to the two-volume "Administrative Record," dated September 21, 2001, as "AR."  The three-volume preliminary injunction record, plus the supplement to the preliminary injunction administrative record, which together contain 149 documents, will be referred to as "PI AR."  The two-volume administrative record, dated July 23, 2001, and containing 45 documents, will be cited as "FWS AR."  Finally, the administrative record for the Dry and Davis Allotments is in two volumes.  The first volume is the June 1999 record that contains 128 documents.  The Court will refer to this administrative record as "DD AR."  The second volume is the September 13, 2001 record, whose final document is #67.  This Court will refer to this second volume as "DD AR2."

[3]These acreage numbers listed for the Sacramento Allotment do not include the Dry and Davis Allotments.

Among the smaller allotments were the Dry Allotment and the Davis Allotment.  See id.  The Dry

Allotment consists of approximately 17,309 acres, and the Davis Allotment consists of about

5,448 acres.  DD AR2 6 at 3.  The 1980 grazing permit issued to High Nogal provided that the

Dry and Davis Allotments were to be managed in conjunction with the Sacramento Allotment.

DD AR2 3.  Moreover, the 1980 AMP included the Dry and Davis Allotments as part of the

consolidated Sacramento Allotment.  Id.  After the High Nogal Ranch declared bankruptcy, the

Sacramento term grazing permit was issued to the Ruidoso Land Company.  DD AR2 16, 26.

The face of the 1984 term grazing permit issued to the Ruidoso Land Company did not make

reference to the management of the Dry and Davis Allotments.  DD AR2 26.  However, the 1984

term grazing permit incorporated the terms of the 1980 AMP, which included the Dry and Davis

Allotments as part of the Sacramento Allotment.  Id. at 3.  Subsequent permits issued for the

Sacramento Allotment to the Sacramento Cattle Company, the successor to the Ruidoso Land

Company, also did not make reference to the Dry and Davis Allotments on the face of the

permits.  See DD AR2 36, 38.

        The Forest Service issued a term grazing permit to the SGA, the successor to the

Sacramento Cattle Company, for the Sacramento Allotment on November 27, 1989 (the "1989

permit").  DD AR2 42 at 1.  Subject to terms and conditions, this permit allowed SGA to graze

up to 553 cattle on the allotment for a period of ten years.  Id. at 1.  While the face of the 1989

term permit did not refer to the Dry and Davis Allotments, the 1989 permit incorporated the 1980

AMP.  Id. at 6.  The 1989 term grazing permit for the Sacramento Allotment expired on

November 27, 1999.  The Forest Service issued another ten-year grazing permit to the SGA for

the Sacramento Allotment, with the same 553-head grazing limit, on November 23, 1999 (the "1999 permit").  PI AR 63 at 1.

      B.      **The Mexican Spotted Owl**

The MSO was listed as a threatened species under the ESA on March 16, 1993.  58 Fed. Reg. 14248 (Mar. 16, 1993). The MSO is one of three subspecies of spotted owl occurring in the United States.  65 Fed. Reg. 45336 (July 21, 2000).  According to the Recovery Plan for the MSO, 91% of MSOs in the United States in 1990 to 1993 were located on Forest Service lands. Id.  Most MSOs are found within eleven National Forests in New Mexico and Arizona.  Id.  Of the Protected Activity Centers ("PACs") for the MSO, 46 are located, at least partially, within the Sacramento Allotment.  PI AR 60 at 20.  The MSO population density in this area is high.  See PI AR 38 at 5; PI AR 73 at 42.

The MSO inhabits mixed coniferous and pine/oak forests, canyons, desert caves, and riparian areas throughout the southwestern United States.  PI AR 47 at 2.  The MSO subsists on a variety of mammals, birds, reptiles, and insects.  58 Fed. Reg. 14248 (Mar. 16, 1993).  In the Lincoln National Forest, the MSO's main prey preferences are wood rats, deer mice, and voles, in that order.  PI AR 92 at 3.  "Voles" represent a genus level category that includes two vole species, the long-tailed vole and the Mexican vole.  PI AR 113 at 5.  Both species of voles are prey of the MSO.  Id. at 6.  Mexican vole populations are found almost exclusively in montane meadows and are not present in significant numbers in mixed-conifer habitats, while long-tailed voles do attain appreciable numbers in mixed-conifer forests.  Id. at 5.  Although Mexican voles are the most abundant MSO prey species in meadow habitats, meadows comprise only approximately 4% of habitat available to MSOs for foraging.  Id. at 6.  Voles provide only 10% to

12% of the MSO's dietary biomass, and the MSO selects voles only when woodrats and mice are less available.  Id. at 5-6.

In 1996, James Pat Ward, Jr., a wildlife biologist, completed a study on the status of Mexican vole populations in the Sacramento Mountains during the period from 1991 to 1996.  PI AR 58.  The results of the report showed that there was a threshold value of 2.4 inches of ground cover height, at or below which few, if any, Mexican voles are present.  Id. at 3; FWS AR 9 at 8.  The study also determined that a linear relationship existed between herbaceous ground cover height and vole numbers, meaning that the higher the ground cover height, the greater number of voles.  See PI AR 58 at 3; FWS AR 9 at 8.  According to the Ward study, a 4-inch herbaceous ground cover height corresponded to approximately 50 voles per acre.  See FWS AR 9 at 8.  Mr. Ward noted, however, that this study "did not include information linking the amount of Mexican voles needed during the summer to support Mexican spotted owls in the Sacramento Mountains . . . that relationship is complex and has yet to be fully quantified."  PI AR 113 at 6. Mr. Ward further admitted that "existing information does not provide a means for precisely evaluating the effects of 4-inches of stubble height on persistence of Mexican spotted owls in the Sacramento Mountains."  Id. at 7.

Grazing by livestock and wildlife occurs throughout the range of the MSO, and, depending on the intensity, has the potential to influence habitat composition and structure and to affect food availability for the owl.  PI AR 38 at 3.  Grazing can influence the MSO by altering (1) prey availability, (2) susceptibility of owl habitat to fire, (3) the health and condition of riparian communities, and (4) development of habitat.  Id.  According to the 1995 Recovery Plan for the MSO, grazing in the long term may reduce dense grass cover, creating favorable habitat for deer

10

mice and unfavorable habitat for voles, meadow jumping mice, and shrews.  Id.  However, in the

short term, grazing may improve conditions for the MSO to detect and capture prey.  Id. at 4.

Excessive grazing in riparian areas can reduce or eliminate important shrub, tree, forb, and grass

cover, all of which support the owl or its prey.  Id.  Although the Forest Service acknowledged in

the Recovery Plan that the threat of human and natural disturbances to the MSO's persistence

cannot currently be quantified, the agency listed grazing among the major threats to MSO

populations.  Id. at 5.  Grazing is considered a threat if residual herbaceous levels do not provide

for prey base cover and forage and if there is increased human activity from grazing-related

activities.  PI AR 60 at 20; see also PI AR 73 at 42.

        In 1996, the Forest Service incorporated the recommendations set forth in the 1995 MSO

Recovery Plan into all of the forest plans in the Southwest Region.  See PI AR 40 at 1 (Record of

Decision for Amendments of Forest Plans).  In regard to livestock grazing, the Forest Service is

required to maintain owl prey availability, to maintain and restore riparian ecosystems, to promote

development of owl habitat, and to strive to attain good to excellent range conditions.  Id. at 90.

The Forest Service also must ensure that forage use by grazing ungulates is maintained at or

above a condition that assures recovery and continued existence of threatened or endangered

species.  Id. at 94.

        C.      **Grazing History and ESA Consultations on the Sacramento Allotment**

        Range conditions on the Sacramento Allotment improved between 1962 and 1992.  PI AR

43 at 7.  This improvement is attributed to natural recovery from the severe drought in the 1950s,

management changes in the mid-1970s, implementation of a rotation grazing system, a 12-year

period of conservative stocking (1979-1990), and above average rainfall.  Id. at 7-8.  Moreover,

11

during the period 1983-1989, actual use on the allotment averaged only 30% of permitted numbers, with at least one year of total rest.  Id. at 8.  Since the stocking of full permitted numbers of cattle in 1991, however, forage use levels in most areas have exceeded proper levels on the Sacramento Allotment.  AR 10 at 8.

In March 1996, the Forest Service completed a report to determine the proper carrying capacity of the Sacramento Allotment.  AR 10 at 2.  The analysis determined that there were stocking problems on the allotment and recommended that the permitted numbers of livestock be reduced to 412 cattle and five horses on the summer range and 335 cattle and 5 horses on the winter range.  Id. at 21.  The Forest Service explained that one of the reasons behind the stocking problems on the Sacramento Allotment was that the previous grazing capacity of 553 cattle was calculated when the Dry and Davis Allotments were considered part of the Sacramento Allotment.  Id. at 3.  The grazing capacity of 553 cattle continued to be implemented despite the removal of the Dry and Davis Allotments from the Sacramento Allotment, resulting in at least a 36% higher grazing load on the remaining acreage in the 1990s compared to the 1970s and 1980s.  Id.; PI AR 43 at 6-7.[4]  Moreover, the prior grazing levels were set without considering the presence of a significant number of elk, which compete with the cattle for forage.  AR 10 at 5.  The Forest Service's analysis also determined that excessive forage use in riparian zones was a problem.  Id. The report noted, "It is critical that Forest Plan guidelines of a maximum of 40% in riparian zones be met in the future."  Id.  Based on this analysis, the Forest Service concluded that future monitoring of forage use on the allotment was vital.  Id.

---

[4]The issue of the inclusion of the Dry and Davis Allotments in the Sacramento Allotment is fully considered later in this Memorandum Opinion and Order.

In response to concerns arising from this 1996 report, the Forest Service enlisted two third-party range experts, Dr. Dee Galt and Dr. Jerry L. Holechek, to conduct an independent assessment of range conditions.  See AR 31; PI AR 43 at 4.  In 1998, Dr. Galt and Dr. Holechek released the results of their study.  PI AR 43.  The study concluded that the Sacramento Allotment had inadequate grazing capacity for 553 cattle when grazing use by elk was taken into account.  Id. at 26.  The study recommended that, for a five-year period, cattle numbers on the summer range be reduced to around 450 head, and on the winter range, to between 300-350 head. Id.  The independent analysis also determined that a reduction in the elk herd on the summer range was needed to improve range conditions.  Id. at 27.

The Forest Service applies a 35% maximum allowable forage use standard on the summer range of the Sacramento Allotment.  See AR 10 at 11; PI AR 73 at 43.  From 1993 to 1999, however, the average forage use for key sites was 70%, indicating that grazing on the Sacramento Allotment exceeded the applicable grazing standard each of those years.  Forest Guardians Opening Br. (Doc. No. 191), Ex. 5.  Additionally, a 1999 analysis by the Forest Service on the winter range of the Sacramento Allotment showed that range conditions had degraded on the allotment since 1993.  AR 69a at 3.  The study determined that the decline in quality in vegetation and soil categories was caused by over-utilization.  See id.  Furthermore, according to the Forest Service, less than 10% of the riparian zones associated with perennial streams on the Sacramento Allotment were in satisfactory condition.  FWS AR 28 (64 Fed. Reg. 24,133 (May 5, 1999)).

In September 1999, the Forest Service completed its first BA for the Sacramento Allotment. PI AR 60.[5] The September 1999 BA considered the effects of issuing a grazing permit that would allow 412 cattle and 5 horses on the summer range and 335 cattle and 5 horses on the winter range. Id. at 2.[6] In this BA, the Forest Service determined that the issuance of such a grazing permit was "likely to adversely affect" the MSO. Id. at 23. However, the Forest Service noted that the effects on the owl would be "small." Id. at 22. Moreover, the Forest Service determined that the new permit would "improve habitat conditions for the Owl over the 10 year permit period." Id. at 23.

Despite the findings of the September 1999 BA, the Forest Service did not go forward with a new permit authorizing 412 cattle and 5 horses on the summer range and 335 cattle and 5 horses on the winter range. Instead, on November 23, 1999, the Forest Service issued a ten-year grazing permit for the Sacramento Allotment that allowed the SGA to graze 553 cattle year-round. PI AR 63 at 1. Moreover, on January 24, 2000, the Forest Service issued the 2000 AOIs to the SGA, which permitted the grazing of 553 cattle. PI AR 66 at 1-2. The Forest Service admits in its brief that the Forest Service did not engage the FWS in any ESA consultation on the issuance of the 1999 term grazing permit for the Sacramento Allotment. See Fed. Defs. Resp. (Doc. No. 213) at 16. Forest Guardians filed this suit on April 6, 2000, challenging the Forest Service's issuance of the 1999 grazing permit.

---

[5]On January 5, 2000, the Forest Service completed an addendum to the September 1999 permit, which assessed the effects of the new grazing permit on the Sacramento Prickly-poppy. This addendum did not affect the September 1999 findings regarding the MSO. PI AR 60.

[6]Grazing on the summer range occurs from May 15 to October 31; grazing on the winter range occurs from November 1 to May 14. PI AR 60 at 2.

On April 21, 2000, the Forest Service transmitted to the FWS a consolidated BA for 64 grazing allotments in the Southwest.  PI AR 73 at 41-43; AR 104 at 3.  This consolidated BA included a summary of the findings in the September 1999 BA for the proposed permit changes on the Sacramento Allotment (412 cattle on 5 horses on the summer range and 335 cattle and 5 horses on the winter range).  Id.  The April 2000 BA listed the Sacramento Allotment as one of six allotments in which livestock grazing was "likely to adversely affect" a protected species.  PI AR 73 at 8.  The Forest Service determined that grazing "may affect" and was "likely to adversely affect" the MSO because the level of grazing might reduce prey cover below recommended levels during the summer grazing season and might cause some minor disturbance to the owl during its breeding season.  Id. at 42.  The Forest Service recommended the following mitigation measures to provide adequate cover for prey species:  (1) prohibiting grazing unless the herbaceous layer height is 1-2 inches and a minimum of 4 inches of height is present during the grazing period; (2) establishing two additional monitoring periods; and (3) mandating the relocation and/or removal of livestock if the herbaceous stubble height is less than 4 inches.  Id. at 43.  The Forest Service noted that if all mitigation measures were enforced, there should be no long-term effects on the MSO from grazing.  Id.

On May 8, 2000, the Forest Service amended the 2000 AOIs for the Sacramento Allotment, effective June 1, 2000.  PI AR 83; AR 94.  The revised AOIs reduced the permitted livestock numbers for the summer from 553 cattle to 428 cattle.  Id. at 2.  The amended 2000 AOIs continued to allow the grazing of 553 cattle during the winter.  Id.  The Forest Service gave several reasons for the amendments:  (1) monitoring of forage utilization in 1998 showed an average 80% utilization, which far exceeded the 35% maximum allowable use; (2) residual plant

residue was below the requisite amount for the MSO; (3) lack of moisture severely reduced early forage growth potential; and (4) poor moisture conditions combined with heavy elk use reduced plant vigor on forage species.  Id.  Subsequently, the SGA informed the Forest Service that they had removed the requisite livestock from the Sacramento Allotment to comply with the May 8, 2000 order.  PI AR 91.

On May 31, 2000, the Forest Service completed a Section 7(d) analysis in which the Forest Service determined that, under the amended 2000 AOIs for the Sacramento Allotment, livestock grazing would not result in the "irreversible or irretrievable commitment of resources" during the consultation process.  PI AR 92 at 6.  The Forest Service concluded that the reduced livestock use was expected to maintain a 4-inch stubble height, as needed to sustain Mexican vole populations.  Id. at 5-6.

In July 2000, monitoring of the Sacramento Allotment revealed that the reduced livestock numbers were not sufficient to maintain the 4-inch stubble requirement.  PI AR 102 at 1-2; AR 104 at 5.  In response to these results, the Forest Service again amended the AOIs for the allotment to require the SGA to remove an additional 98 cattle, for a maximum allowable number of 330 cattle during the summer.  Id.  The SGA failed to notify the Forest Service that it complied with the requisite removal of livestock.  See PI AR 108.  In response to the SGA's failure to notify the Forest Service, the Forest Service sent the SGA a letter on August 18, 2000, ordering the SGA to show cause why the term grazing permit should not be suspended or canceled.  Id. On August 24, 2000, the SGA sent a letter to Regional Forester Eleanor Towns informing the Forest Service that the SGA would not remove the additional 98 cattle from the allotment because of the economic hardship that would result.  PI AR 110 at 6-7.  As a sanction, on

September 8, 2000, the Forest Service suspended 40% of the term permitted numbers for two

years, meaning that a maximum of 330 cattle would be allowed on the allotment through the 2002

summer grazing season.  PI AR 113A.

On August 25, 2000, the SGA filed suit against the Forest Service challenging, among

other things, the 125-head and 98-head reductions in cattle and the alleged exclusion of the Dry

and Davis Allotments from the Sacramento Allotment.  After the SGA's and Forest Guardians'

suits were consolidated, the SGA amended its complaint to bring other claims, including a

challenge to the reduction of livestock numbers by 40%.  See SGA's First Am. Compl. (Doc. No.

72).

In mid-August of 2000, the Forest Service realized that it had not prepared a BA or

consulted with the FWS over the ongoing grazing on the Sacramento Allotment, as authorized by

the 1999 permit.  AR 104 at 5.  As a result of its omission, on August 16, 2000, the Forest

Service prepared and submitted to the FWS another BA that applied to ongoing grazing on the

allotment.  PI AR 106.  The August 2000 BA considered the effects of grazing 200 to 412 head

of livestock on the Sacramento Allotment for a maximum period of three years, or until the NEPA

process and consultation was completed, whichever was shorter.  Id. at 2.  The Forest Service

explained that only the effects of grazing 200 to 412 cattle were considered because those were

the number of cattle expected to be authorized to graze on the Sacramento Allotment.  Id.  The

Forest Service concluded that the ongoing grazing activities "may affect, but are not likely to

adversely affect" the MSO.  Id. at 7.

As grounds for its conclusion, the Forest Service noted that the allowable use level of

35% on the summer range would result in a minimum 4-inch ground cover height and residual

grass cover, which combined, would provide sufficient cover for rodent prey species throughout the year. Id. at 6.[7] The Forest Service determined that the 4-inch stubble height standard would provide sufficient prey for the MSO based on the 1996 study by Pat Ward. Id. The Forest Service noted that the 4-inch herbaceous ground cover height was expected to be met 10 days after the onset of summer rains during the months of July and August and that range conditions were fair and soil conditions satisfactory. Id. at 6-7.

Nevertheless, the FWS refused to concur with the August 2000 BA's finding that the MSO was not likely to be adversely affected by grazing on the Sacramento Allotment. FWS AR 10 at 2. The FWS based its refusal on two concerns: (1) the 4-inch stubble height requirement, while possibly met in the months of July and August, might not be met from October 31 to July 1 during years of little snow pack and spring drought, and (2) the agency failed to address the issue of recruitment of woody vegetation in riparian areas. Id.

Consequently, the Forest Service submitted a revised BA on November 1, 2000, which, once again, considered the effects of grazing 200 to 412 cattle on the Sacramento Allotment for a three-year period. FWS AR 9 at 2. Like the August 2000 BA, the November 2000 BA determined that the ongoing grazing activities, which were subject to the AOIs, were "not likely to adversely affect" the MSO. Id. at 11. Unlike the August 2000 BA, however, the November 2000 BA gave a more extensive explanation of the Forest Service's proposed monitoring schedule for the Sacramento Allotment, provided for additional monitoring periods, included management

---

[7]As for the winter range, the Forest Service noted that rodent prey cover is not a concern since the two PACs located in the winter range are not accessible to cattle due to steep slopes and rocky terrain. Thus, rodent prey cover should not be affected by grazing on the winter range. PI AR 106 at 6.

actions to be implemented during drought conditions, discussed in detail the Ward study and the

reasons for the use of the 4-inch stubble height requirement, and set forth the monitoring results

from July and August 2000, which showed ground cover heights of greater than 4 inches.  Id. at

2-4, 8-10.

On February 2, 2001, the FWS issued a letter concurring in the "not likely to adversely

affect" determination for the MSO in the November 2000 BA.  FWS AR 5.  The FWS based its

concurrence on the following information in the November 2000 BA:  (1) the statement that,

within PACs, AOIs provide for recruitment of woody vegetation and herbaceous vegetation with

the requisite residual height; (2) the description of the monitoring that will determine forage

utilization; (3) the results from the July and August 2000 summer pasture monitoring; and (4) the

potential implementation of the management plan for drought conditions.  Id. at 2.  As a result of

this concurrence, Forest Guardians amended its complaint to add a claim challenging the FWS's

concurrence with the November 2000 BA.  See Forest Guardians' First Am. Compl.(Doc. No.

147) at 14-15.

## III.    Standard of Review

This Court sits as an appellate court with respect to reviewing Plaintiff's claims regarding

agency action.  Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994).

Review of agency decisions, as well as review of ESA and NFMA claims, are governed by

Administrative Procedures Act ("APA") standards to determine whether the opinion is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A).  See Wyoming Farm Bureau Federation v. Babbitt, 199 F.3d 1224, 1231 (10th Cir.

2000) (review of ESA claims governed by APA); Biodiversity Legal Foundation v. Babbitt, 146

19

F.3d 1249, 1252 (10th Cir. 1998) (in examining whether FWS's actions violate ESA, court relies on standards of review provided in APA); Friends of the Bow v. Thompson, 124 F.3d 1210, 1217 (10th Cir. 1997) (reviewing NFMA claim according to deferential judicial review standards of the APA).  This deferential standard is designed to ensure that an agency's decision was based on relevant factors and that it contained no "clear error of judgment."  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  In deciding disputes that involve primarily issues of fact requiring a high level of technical expertise, the court "must defer to 'the informed discretion of the responsible federal agencies.'"  Marsh v. Oregon Natural Resources Council, 490 U.S. at 377 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)).  The focus of judicial review of the decision should be on the administrative record already in existence.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985); National Wildlife Federation v. U.S. Army Corps. of Engineers, 132 F.Supp.2d 876, 889 (D. Or. 2001).

## IV.    Discussion of Forest Guardians' Appeal

### A.    ESA Section 7 Consultation

Forest Guardians claims that the Forest Service violated the ESA by failing to initiate formal Section 7 consultation regarding the impacts of issuing the 1999 grazing permit on the Sacramento Allotment.  Forest Guardians contends that the Forest Service's and FWS's consultation on the effects of grazing only 200 to 412 cattle for a three-year period was insufficient to satisfy their ESA Section 7 consultation obligations.  The Federal Defendants counter that the Forest Service did not violate the ESA because the agency did not have the discretion to modify the terms and conditions of the 1989 grazing permit when it issued the 1999

permit.  The Federal Defendants assert that the Forest Service was required by Section 504(b) of

the Rescissions Act to issue the 1999 permit under the same terms and conditions as those in the

expiring 1989 permit.  Rescissions Act, Pub. L. No. 104-19, 109 Stat. 194 (1995).[8]  Additionally,

the Federal Defendants argue that the consultation between the Forest Service and FWS on the

effects of grazing only 200 to 412 cattle for a three-year period satisfied their ESA Section 7

duties.

          1.      **The Rescissions Act of 1995**

Under the ESA, an agency action includes the granting of a grazing permit.  50 C.F.R.

§ 402.02.  Section 7 of the ESA applies to all agency actions in which there is discretionary

involvement or control by the federal agency.  50 C.F.R. § 402.03.  Where the federal agency

lacks the discretion to influence the agency action, Section 7 consultation is not required.  See

Sierra Club v. Babbitt, 65 F.3d 1502, 1509 (9th Cir. 1995).  Thus, if the Rescissions Act removed

all discretion from the Forest Service in issuing the 1999 grazing permit for the Sacramento

Allotment, then the Forest Service would not have been required to engage in Section 7

consultation.

Historically, the Forest Service had not prepared NEPA analyses for the issuance of

grazing permits.[9]  PI AR 39 at 2.  In November 1994, in response to various court decisions, the

---

    [8]The Rescissions Act was attached as a rider to the "1995 Emergency Supplemental
Appropriations for Additional Disaster Assistance, for Anti-Terrorism Initiatives, for Assistance in
the Recovery from the Tragedy That Occurred at Oklahoma City, and Rescissions Act."

    [9]Congress enacted NEPA in order to force federal agencies to consider the environmental
consequences of their proposed activities.  Sierra Club v. Babbitt, 65 F.3d 1502, 1505 (9th Cir.
1995).  NEPA mandates that an agency consider every significant aspect of the environmental
impact of a proposed action.  Baltimore Gas and Elec. Co. v. Natural Resources, 462 U.S. 87, 97
(1983) (citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,

Forest Service implemented a policy to conduct NEPA analyses for the reissuance of grazing permits.  See id.  It soon became apparent, however, that the Forest Service would be unable to carry out the vast number of NEPA reviews in time to reissue expiring permits.[10]  In response to the looming threat that many grazing permits would not be reissued for failure to complete the requisite NEPA analysis, Congress enacted the Rescissions Act.

The Rescissions Act provided a temporary exemption from NEPA for those permits that were set to expire before the requisite NEPA analyses could be completed.  Greater Yellowstone Coalition v. Bosworth, 209 F.Supp.2d 156, 158-59 (D.D.C. 2002).  Section 504(a) of the Act required each National Forest System unit to establish and adhere to a schedule for conducting NEPA reviews on all the grazing allotments within that unit.  Section 504(b) of the Act mandated that permits that came up for reissuance before the time stated in the schedule for conducting NEPA reviews be reissued automatically on the same terms and conditions, subject to modification or reissuance upon completion of the NEPA analyses.  The Act provides:

---

Inc., 435 U.S. 519, 553 (1978)).  NEPA requires a federal agency to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C).  The EIS is a detailed written statement that discusses significant environmental impacts and reasonable alternatives that would avoid or minimize adverse impacts to the environment.  40 C.F.R. § 1502, 1508.11.  A federal agency will usually prepare an environmental assessment ("EA") to determine whether an EIS is necessary.  40 C.F.R. § 1508.9(a); Sierra Club, 65 F.3d at 1505.  If the agency makes a finding of no significant impact, then the agency does not need to prepare an EIS.  40 C.F.R. § 1508.9(a), § 1508.13.  However, if the EA indicates that the proposed action will significantly affect the environment, then an EIS is required.  42 U.S.C. § 4332(2)(C).  The NEPA analysis may be consolidated with the Section 7 consultation requirements of the ESA, but compliance with NEPA does not relieve the agency of its ESA obligations.  50 C.F.R. § 402.06.

[10]Approximately 2,660 permits requiring NEPA analysis were scheduled to expire on December 31, 1995.  Another 900 permits requiring NEPA reviews were to expire on December 31, 1996.  PI AR 39 at 2.

(a) SCHEDULE FOR NEPA COMPLIANCE. – Each National Forest System unit shall establish and adhere to a schedule for the completion of [NEPA] analysis and decisions on all allotments within the National Forest System unit for which NEPA analysis is needed.  The schedule shall provide that not more than 20 percent of the allotments shall undergo NEPA analysis and decisions through fiscal year 1996.

(b) REISSUANCE PENDING NEPA COMPLIANCE. – Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule developed by individual Forest Service System units, shall be issued on the same terms and conditions and for the full term of the expired or waived permit.  Upon completion of the scheduled NEPA analysis and decision for the allotment, the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis.

(c) EXPIRED PERMITS. – This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

Pub. L. No. 104-19, § 504, 109 Stat. 194, 212-13 (1995).

In order to comply with Section 504(a) of the Rescissions Act, the Southwest Region of the Forest Service established a schedule for NEPA compliance.  See DD AR2 52.  According to this schedule, the date set for the completion of the Sacramento Allotment's NEPA analysis was 1996.  See id. at 3-2.  The Forest Service, however, did not complete the NEPA review for the Sacramento Allotment by the scheduled date, and in fact, to date, the NEPA analysis for the Sacramento Allotment is still not complete.[11]  Nevertheless, on November 23, 1999, when the

---

[11]The Forest Service attributes the delay in completion of the NEPA analysis for the Sacramento Allotment to complications arising from the Forest Service's 1996 analysis that suggested that livestock numbers needed to be reduced on the allotment.  See Fed. Defs. Resp. (Doc. No. 213) at 12.  Because subsequent analyses indicated that a full-blown EIS should be prepared, the Forest Service was not able to complete the NEPA review for the reissuance of the 1989 permit before the date when the 1989 permit was set to expire.  Id.

23

1989 grazing permit for the Sacramento Allotment was about to expire,[12] the Forest Service

reissued a 10-year grazing permit for the Sacramento Allotment.  PI AR 63.

The Federal Defendants argue that its reissuance of the 1999 permit could not have

violated the ESA because the Forest Service did not have any discretion in renewing the permit.

The Federal Defendants claim that Section 504(b) of the Rescissions Act mandated that the 1989

permit be renewed on the same terms and conditions because the NEPA analysis for the

Sacramento Allotment had not been completed.  This argument is flawed for four reasons.

First, the Rescissions Act by its terms does not apply to this situation.  Section 504(b) only

applies to permits that expire "before the NEPA analysis and decision pursuant to the schedule"

developed according to Section 504(a).  In this case, the Section 504(a) schedule established by

the Forest Service for the Sacramento Allotment set 1996 as the deadline for NEPA completion.

The 1989 permit for the allotment did not expire until December 31, 1999.  Thus, the Sacramento

grazing permit did not expire before the completion of the NEPA analysis "pursuant to the

schedule developed" for the Lincoln National Forest.  Hence, when the Forest Service renewed

the 1989 permit for the Sacramento Allotment in 1999, the time allowed for NEPA compliance

under the Rescissions Act had already passed.

The Rescissions Act requires the Forest Service to "establish and adhere to" a NEPA

schedule.  The Act does not allow the Forest Service to extend the time for conducting the NEPA

analysis beyond the deadline it establishes in the schedule so as to avoid its obligations under

NEPA.  See Greater Yellowstone, 209 F.Supp.2d at 162-63; Forest Guardians v. Veneman, No.

---

[12]The 1989 permit for the Sacramento allotment would have expired on December 31,
1999.  Forest Guardians' Reply (Doc. No. 242), Ex. 3 at 2.

01-138 TUC-DCB, slip op. at 16 (D. Ariz. Oct. 28, 2002).  The Rescissions Act provides only a

"temporary exemption from NEPA and relieves the permittees of harsh consequences only if the

Service had adopted and adhered to a schedule."  Greater Yellowstone, 209 F.Supp.2d at 162-63.

In Greater Yellowstone, the Forest Service established a NEPA compliance schedule

setting 1998 as the deadline for completing the NEPA analysis on the impact of a grazing permit

for the Horse Butte Allotment.  Id. at 159.  Although the Forest Service later revised the NEPA

deadline for a later date, the original 1998 date came and went and the Forest Service had failed

to initiate, let alone complete, the NEPA analysis for Horse Butte.  Id. at 159-60.  Relying on

Section 504(b) of the Rescissions Act, the Forest Service reissued the grazing permit for the

Horse Butte Allotment for an additional ten years on the same terms.  Id. at 160.  The district

court, however, held that the temporary exemption available under the Rescissions Act did not

apply.  Id. at 162.  The court reasoned that the original Rescissions Act schedule set the NEPA

compliance deadline, and when that deadline passed, the window of exemption closed.  Id. at 161.

The court determined that the plain language of the Rescissions Act did not allow for modification

of the NEPA compliance schedule:

> The Rescission Act's plain language indicates without ambiguity that the Service
> may not amend its § 504(a) schedule for NEPA compliance.  As a fundamental
> principle of statutory interpretation, a court is required to give effect to every word
> Congress uses in a statute.  Reiter v. Sonotone Corp., 442 U.S. 303, 339, 99 S.Ct.
> 2326, 60 L.Ed.2d 931 (1979).  The word "adhere" can only lend itself to one
> interpretation.  Webster's defines "adhere" to mean to "bind oneself to observance
> (as of a treaty)."  Webster's Third New International Dictionary 25-26 (1976).
> Thus, when Congress commanded the Service to "establish and adhere to a
> schedule" for NEPA compliance, it left no room for the Service to later modify
> that schedule.

Id.  The district court noted that its interpretation of the Rescissions Act was consistent with the

legislative history behind the Act, as Congress did not issue a blanket exemption to the Service to conduct the NEPA analyses for an indefinite length of time.  See id. at 162.  In fact, such a bill was discussed and passed over.  Id.  Instead, Congress insisted that the NEPA analyses be completed within a certain length of time and that the Forest Service adhere to the schedule it established.  Id.

Similarly, the district court in Forest Guardians v. Veneman, adopting the analysis of Greater Yellowstone, held that the Rescissions Act did not apply to the issuance of grazing permits that expired after the NEPA analysis completion date established in the NEPA schedule. No. 01-138 TUC-DCB, slip op. at 18 (D. Ariz. Oct. 28, 2002).  In Veneman, as in this case, the Forest Service argued that it was not obligated to comply with the ESA Section 7 consultation requirements in reissuing grazing permits because the Rescissions Act divested the Forest Service of discretion to modify the grazing permits.  Id. at 10.  The district court rejected this argument, holding that the Rescissions Act did not remove the Forest Service's discretion to modify grazing permits outside the window of time set by the Rescissions Act Allotment Schedule.  Id. at 18. The court noted that extensive delays in implementing the NEPA decisions "are contrary to the intent of the Rescissions Act, which provided a limited and specific time period of exemption from NEPA compliance."  Id.

This Court finds the reasoning of Greater Yellowstone and Veneman persuasive.  See also Forest Guardians v. United States Forest Service, No. 01-504 MCA/KBM, slip op. at 28-32 (D.N.M. Dec. 31, 2002) (holding that Rescissions Act did not deprive Forest Service of discretionary involvement or control over reissuance of ten-year grazing permit).  The requirement of Section 504(a) that the National Forest System unit "shall establish and adhere" to

the NEPA schedule does not allow the Forest Service flexibility in extending the deadlines for

NEPA completion.  To construe the Act as the Forest Service urges would mean ignoring the

plain terms of Section 504(b) and allowing the Forest Service to continue to amend and modify

the NEPA schedule indefinitely in order to avoid its obligations under NEPA, the ESA, and other

applicable laws.  This result is contrary to the intent of the Rescissions Act to permit only a

temporary delay for the Forest Service to complete the requisite NEPA analyses.  Consequently,

because the 1989 permit did not expire until three years after the scheduled NEPA completion

date for the Sacramento Allotment, the Rescissions Act did not remove the Forest Service's

discretion in reissuing the 1989 grazing permit.

Second, even if the 1996 NEPA schedule had been met, the scope of the Rescissions Act

is more limited than Federal Defendants contend.  Section 504(c) provides:  "This section shall

*only* apply if a new term grazing permit has not been issued . . . *solely* because the analysis

required by NEPA and other applicable laws has not been completed . . . ."  (emphasis added).

According to this section, even for those permits that will expire before the NEPA completion

date set by the schedule, the Act does not mandate that the Forest Service reissue the permit if

there are other reasons – aside from the incomplete NEPA analysis – that counsel against the

reissuance of the permit, for instance, if the reissuance of the permit would violate the ESA or

NFMA.

The record reflects that this interpretation regarding the narrow scope of the Rescissions

Act was originally held by the Forest Service.  PI AR 37 at 2 (statement of the Chief of the Forest

Service explaining that the Rescissions Act still left the agency with "the authority to make a

decision not to issue a new permit for reasons other than not having the analysis required by

NEPA and other applicable laws completed").  In addition, the legislative history indicates that Congress enacted the Rescissions Act only as a temporary exemption from NEPA.  See Greater Yellowstone, 209 F.Supp.2d at 162-63.  Nothing in the legislative history or the language of the Rescissions Act suggests that Congress intended to issue to the Forest Service a blanket suspension from NEPA, the ESA, and the NFMA.  In fact, the legislative history actually indicates that Congress considered, yet rejected, a bill that would have established a blanket exemption from NEPA for the reissuance of grazing permits.  Id. at 162.  Given the much more limited scope of the Act that Congress ultimately enacted, this Court is reluctant to read into the Rescissions Act a broad suspension of the requirements of the ESA and the NFMA, particularly given that the legislation at issue here was a rider to an appropriations bill that passed without congressional debate.  As the Tenth Circuit noted, "[R]epeals (or suspension) of legislation by implication are disfavored, especially 'when the claimed repeal rests solely on an Appropriations Act.'"  Forest Guardians v. Babbitt, 174 F.3d 1178, 1192 (10th Cir. 1999) (quoting Tennessee Valley Auth. v. Hill, 437 U.S. 153, 190 (1978)).  This Court, therefore, concludes that the Rescissions Act did not deprive the Forest Service of the discretionary control to modify, suspend, or cancel the 1989 grazing permit for reasons other than the failure to complete the NEPA analysis.

Third, the Federal Defendants' argument that it lacked discretion to issue the 1999 grazing permit under the Rescissions Act is undermined by the fact that the grazing permit itself gave the Forest Service the discretion to modify the permit terms.  See Federal Lands Legal Consortium v. United States, 195 F.3d 1190, 1198 (10th Cir. 1999) (discussing discretion Forest Service possesses to require changes in grazing permits as agency deems necessary); Waterwatch of

Oregon v. United States Army Corps of Engineers, 2000 WL 1100059 (D. Or. June 7, 2000) (holding that Corps retained discretionary involvement and control over 1971 and 1978 permits, which expressly allowed for modification of permits at any time if in public interest, subjecting Corps to ESA Section 7 consultation requirements); PI AR 37 at 4-5 (letter from Chief of Forest Service stating that "the terms and conditions of expiring permits and new permits issued on those same terms and conditions are, on their face, subject to modification").

Both the 1989 and 1999 Sacramento grazing permits contained the following provision:

> This permit can also be cancelled, in whole or in part, or otherwise modified, at any time during the term to conform with needed changes brought about by law, regulation, Executive order, allotment management plans, land management planning, numbers permitted or seasons of use necessary because of resource conditions, or the lands described otherwise being unavailable for grazing.

DD AR2 42 at 1 (1989 permit); PI AR 63 at 1 (1999 permit) (emphasis added). The language in the permits specifically allow the Forest Service to modify the permits, including the number of livestock permitted, at any time to conform with resource conditions.

The discretion granted to the Forest Service in this case stands in marked contrast to the lack of discretion given to the Federal Energy Regulatory Commission ("FERC") over the reissuance of annual licences to hydroelectric facilities in Platte River Whooping Crane Critical Habitat Maintenance Trust v. Federal Energy Regulatory Commission, 962 F.2d 27 (D.C. Cir. 1992), the primary case relied upon by the Federal Defendants. Section 6 of the Federal Power Act, 16 U.S.C. § 799, provided that licenses issued under the Act could only be altered "upon mutual agreement between the licensee and the Commission." Id. at 32. In Platte River, the court held that FERC did not have the authority to amend power districts' annual operating licenses absent an express reservation of modification authority in the original license. In contrast

29

to <u>Platte River</u>, the 1989 and 1999 permits expressly reserve the Forest Service's right to modify the terms and conditions of the permit at any time.  Therefore, the Rescissions Act did not divest the Forest Service of the discretion built into the permit terms.

Fourth, the notion that the Forest Service did not have discretion is belied by the actions taken by the Forest Service when reissuing the 1999 permit.  Despite the Federal Defendants' insistence that the Forest Service was required to reissue the 1989 permit on the same terms and conditions, the record shows that the Forest Service actually made a number of changes in the 1999 permit.  For example, the 1999 permit contains a provision prohibiting livestock use within certain exclosures, which was not present in the 1989 permit.  <u>Compare</u> PI AR 63 at 6 (section entitled "Wetland and Threatened and Endangered Plant Exclosures), <u>with</u> DD AR2 42 (section not present).  Also, the 1999 permit contains an additional provision not present in the 1989 permit in the section on the Short Age Calf Policy.  <u>Compare</u> PI AR 63 at 7 ("On seasonal ranges, calves under six (6) months of age, as of January 1, shall be permitted on the allotment involved until March 31 without charge and will not be counted as an obligation.  By or on April 1, these calves shall be removed from the allotment area or shall be counted against the term permit numbers and charged for at the current rate."), <u>with</u> DD AR2 42 at 4 (provision not present).  Finally, the 1999 permit changed the way livestock is managed during emergency situations.  <u>Compare</u> PI AR 63 at 8 ("In emergency situations the schedule may be temporarily changed prior to notification and approval of Forest Service."), <u>with</u> DD AR2 42 at 7 ("In emergency situations the schedule may be temporarily changed with the agreement of both the Forest Service and the Board of Directors.").

In sum, notwithstanding the Rescissions Act, the Forest Service had discretion to determine whether or not to reissue the 1989 grazing permit on the same terms and conditions. Because the issuance of a grazing permit is an agency action under the ESA, the Forest Service was required to engage in Section 7 consultation on the issuance of the 1999 grazing permit for the Sacramento Allotment.

        2.        **Sufficiency of Section 7 Consultation**

In this case, the Federal Defendants admit that the Forest Service did not engage the FWS in consultation on the issuance of the 1999 term grazing permit for the Sacramento Allotment. Fed. Defs.' Resp. (Doc. No. 213) at 16. Nevertheless, the Forest Service contends that its submission to the FWS of the November 2000 BA, and the resulting concurrence of the FWS, satisfied the agency's Section 7 consultation requirements.

Under the ESA, the granting of a grazing permit is an agency action subject to Section 7 consultation requirements. See 50 C.F.R. § 402.02(c), §§ 402.13 - 401.14. The meaning of "agency action" is a matter of statutory interpretation that is to be decided by the courts. See Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1053-54 (9th Cir. 1994). The term "agency action" should be interpreted broadly. Id. at 1054. An agency, however, cannot ignore future aspects of a federal action by segmenting that action into phases. See Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988) (holding that FWS violated ESA by failing to prepare comprehensive BOs considering all leasing stages); Greenpeace v. Nat'l Marine Fisheries Serv., 80 F.Supp.2d 1137, 1146 (W.D. Wash. 2000) (holding that National Marine Fisheries Service improperly limited scope of consultation to authorization of 1999 fishery as opposed to entire fishery management plans).

31

In <u>Conner</u>, the Forest Service requested formal consultation with the FWS on a proposed sale of oil and gas leases.  <u>Conner</u>, 848 F.2d at 1452.  The FWS reviewed only the leasing stage because it did not have sufficient information to issue a BO covering post-leasing activities.  <u>Id.</u> Instead of rendering a comprehensive BO, the FWS relied on an incremental-step consultation approach, contemplating additional biological evaluations that would be prepared prior to all subsequent activities.  <u>Id.</u>  The Ninth Circuit held that "the FWS violated the ESA by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action."  <u>Id.</u> at 1454.

In this case, the November 2000 BA was not sufficiently comprehensive to satisfy ESA Section 7 consultation requirements.  The November 2000 BA analyzed the effects of grazing only 200 to 412 head of cattle, whereas the 1999 permit authorizes the grazing of 553 cattle. Also, the November 2000 BA considers grazing effects only for a 3-year period, whereas the 1999 permit is for a 10-year term.

The Federal Defendants argue that the Forest Service's consultation on the effects of grazing 200 to 412 cattle over a three-year period was reasonable because only 200 to 412 cattle were likely to be allowed on the allotment according to the terms of the amended 2000 AOIs. Rather than consult over a hypothetical action, the Forest Service consulted over the effects on the MSO of the likely numbers of livestock that actually would be authorized according to the amended 2000 AOIs.

However, Defendants' reliance on <u>Swan View Coalition, Inc. v. Turner</u>, 824 F.Supp. 923 (D. Mont. 1992), to support this argument is misplaced.  In <u>Swan View</u>, the plaintiffs challenged the consultation conducted on the approval of the Flathead Forest Plan, arguing that the FWS

construed the scope of agency action too narrowly and failed to analyze the impact of many

decisions made in the Plan.  Id. at 928, 933.  The district court disagreed, finding that the broad

programmatic nature of the Forest Plan necessitated the need for future consultations at later

stages of development.  Id. at 935.  Swan View is distinguishable for two reasons.  First, unlike

the broad nature of a forest plan, the granting of the 1999 permit was a relatively simple

transaction that granted certain rights to the permittee and directly led to site-specific grazing.  A

forest plan, however, does not authorize any particular activity.  The issuance of a grazing permit

is thus more akin to the sale of a lease, as in Conner, than the adoption of a forest plan, as in

Swan View.  Second, in Swan View, the FWS considered the standards and guidelines under

which all future development would be taken.  Id.  In contrast, here the Forest Service only

considered the standards and effects of the amended AOIs for a period of three years – the Forest

Service did not consider the effects of grazing for the remaining seven years of the 10-year permit.

Although the amended AOIs restrict the number of cattle permitted to graze on the allotment to

200 to 412 cattle, the amended 2000 AOIs only cover one year.  According to the terms of the

1999 permit, in each subsequent year the Forest Service, through revised AOIs, could allow up to

553 cattle to graze on the allotment.  Having issued a permit allowing up to 553 cattle for 10

years, the Forest Service should have consulted on the effects of permitting up to 553 cattle to

graze on the allotment for 10 years.  To hold otherwise and to allow a federal agency to consult

on only a portion of an agency action would severely erode the Section 7 consultation process in

a way that Congress did not envision.

Therefore, this Court concludes that the Forest Service violated Section 7 of the ESA when it failed to consult with the FWS on the entire effects of issuing the 1999 grazing permit.[13]

Furthermore, when the FWS concurred with the November 2000 BA, it concurred with only a portion of the agency action.  For the same reasons as discussed above, the FWS should have consulted on the effects of the entire agency action, i.e., the issuance of the 10-year term grazing permit.  Hence, the FWS also violated Section 7 of the ESA when it issued its February 2, 2001 concurrence letter.

### B.      National Forest Management Act

The NFMA mandates that permits issued by the Forest Service be consistent with the governing forest plan.  16 U.S.C. § 1604(i).  Count III of Forest Guardians' complaint alleges that the Forest Service violated the NFMA's consistency requirement by issuing the 1999 grazing permit that allows livestock grazing on the Sacramento Allotment at levels beyond the grazing capacity of the allotment.  Forest Guardians points to three provisions in the Lincoln National Forest Plan ("LNFP") that the Forest Service allegedly violated in issuing the 1999 grazing permit.  The first provision is a goal of the Forest Service to "bring permitted grazing use in balance with the forage allocated for use by domestic livestock."  PI AR 2 at 12.  A goal is defined as a "concise statement of the state or condition that a land and resource management plan is designed to achieve.  A goal is usually not quantifiable and may not have a specific date for completion."  36 C.F.R. § 219.3; PI AR 2 at 11.  The second provision is contained in the 1996

---

[13]On May 10, 2001, the SGA filed a motion for summary judgment (Doc. No. 127) on Count I of Forest Guardians' complaint.  The SGA argues that the Forest Service satisfied its Section 7 consultation duties when the Forest Service issued its April 21, 2000 BA and its November 2000 BA.  Because this Court has determined that the Forest Service's consultation was inadequate under the ESA, the SGA's motion for summary judgment will be denied.

Amendment to the LNFP ("1996 Amendment"),[14] which provides the following standard:

"Forage use by grazing ungulates will be maintained at or above a condition which assures

recovery and continued existence of threatened or endangered species."  PI AR 42 at 35.  The

final provision is the 1996 Amendment guideline that mandates that the Forest Service ensure that

consumption by livestock and wild ungulates does not exceed set grazing utilization levels during

the forage growing season.  See PI AR 42 at 35-35a.

The Federal Defendants first argue that the Rescissions Act removed all discretion from

the agency to alter the permit terms to make them consistent with the forest plan.  This Court,

however, has already determined that the Rescissions Act did not remove the Forest Service's

discretion to modify the permit terms according to other laws, such as the ESA and the NFMA,

and that the Rescissions Act did not mandate the issuance of the 1999 permit for the Sacramento

Allotment.  Thus, the requirements of the NFMA apply to the 1999 permit.

In addition, the Federal Defendants claim that the Forest Service is exempt from the 1996

Amendment standards and guidelines regarding forage use because of an injunction issued in

another case in Arizona.  The 1996 Amendment mandates that the Forest Service maintain forage

use to assure the recovery and continued existence of threatened species, and to that end, requires

that the Forest Service ensure that consumption by livestock and wild ungulates does not exceed

set grazing utilization levels during the forage growing season.  The Amendment states that site-

---

[14]In 1996, the Forest Service adopted the "Record of Decision for Amendment of Forest Plans" for the Southwestern Region ("1996 ROD").  PI AR 40.  The 1996 ROD included grazing standards and guidelines to be followed to assure the recovery and continued existence of threatened and endangered species.  These standards and guidelines were incorporated into the 1996 Amendment to the LNFP.  PI AR 42.

specific forage use levels should be developed, but that where site-specific information is unavailable, the Forest Service should not exceed levels set in the Allowable Use Guidelines.

Judge Broomfield issued an injunction in <u>Arizona Cattle Growers Association v. Towns</u>, No. Civ. 97-1868, slip op. (D. Ariz. May 25, 2000), enjoining the Forest Service from using the Allowable Use Guidelines in the 1996 Amendment in any annual operating plan, absent a site-specific analysis of grazing management needs. <u>Id.</u> at 1-2. In this case, the NEPA process is not yet complete, so there is no site-specific analysis for the Sacramento Allotment. The Forest Service argues that, in order to comply with the 1996 Amendment, it would have to violate Judge Broomfield's injunction. Therefore, the Forest Service asserts that the 1999 permit for the Sacramento Allotment need not be consistent with the grazing management standards and guidelines of the 1996 Amendment.

Judge Broomfield's decision, however, is not as expansive as the Forest Service would have this Court believe. Judge Broomfield's decision explicitly enjoins the Forest Service from "including the forage utilization levels found in the table on page 94 of the 'Record of Decision for Amendment of forest Plans,' dated June 5, 1996 ("1996 ROD") in any annual operating plan or similar instructions." <u>Id.</u> at 1. Judge Broomfield's injunction goes no further than to enjoin the use of the Allowable Use Guidelines table. <u>See</u> PI AR 40 (1996 ROD). Judge Broomfield did not enjoin the Forest Service from adhering to the grazing management standard to maintain forage use by grazing ungulates at or above a condition which assures the recovery and continued existence of threatened species. In narrowing the relief, Judge Broomfield explained, "the court has attempted to strike a balance between enjoining actions that undermine its previous order, while at the same time *not prohibiting Defendants from engaging in conduct required by the*

*law*." Arizona Cattle Growers, slip op. at 12 (D. Ariz. May 24, 2000) (emphasis added).  Judge

Broomfield noted, "[T]he court does not intend to unnecessarily affect other pending lawsuits or

to unnecessarily limit Defendants' options in fulfilling their legal obligations."  Id. at 11-12.

Ensuring the continued existence of threatened and endangered species is conduct required not

only by the 1996 Amendment but also by the ESA.  Hence, Judge Broomfield's decision did not

prevent the Forest Service from ensuring that the issuance of the 1999 term grazing permit to the

SGA was consistent with the 1996 Amendment standards and guidelines.

        Moreover, Judge Broomfield's order allowed the Forest Service to use limiting levels on

forage utilization, provided that the levels were supported by appropriate guidelines or other data,

available from a source independent of and apart from the 1996 Amendment.  Arizona Cattle

Growers, slip op. at 2 (D. Ariz. May 25, 2000).  In other words, Judge Broomfield's order did

not enjoin the use of any limitations on forage utilization that could be enforced prior to the 1996

Amendment.  In this case, the 35% forage utilization standard used for the summer range on the

Sacramento Allotment can be traced to a 1979 Allotment Analysis Handbook issued by the Forest

Service for the Southwestern Region.  See AR 10 at 11; Forest Guardians' Opening Br. (Doc.

No. 191), Ex. 4 at 50-5.  Because the 35% grazing standard came from a source independent of

and apart from the 1996 Amendment, Judge Broomfield's order does not preclude the Forest

Service from applying this standard to the Sacramento Allotment.[15]  As a result, this Court must

--------

[15]The SGA argues in its motion for summary judgment (Doc. No. 127) that Count III of
Forest Guardians' complaint should be dismissed because Judge Broomfield's decision enjoined
the use of the Allowable Use Guidelines adopted in the 1996 ROD.  The SGA's motion for
summary judgment as to Count III of Forest Guardians' complaint should be denied for the same
reasons as discussed above.

determine whether the issuance of the 1999 permit was consistent with both the LNFP and the

1996 Amendment to that Plan.

The Federal Defendants' next assertion is that the determination of consistency rests with

the Forest Service and that the Forest Service cannot be required to comply with three particular

provisions in the forest plan to the exclusion of all others, especially when one of the provisions in

the plan is a "goal" -- a general statement of intent without any set deadline.  The Federal

Defendants argue that the Forest Service must be free to use its discretion to balance the

competing standards and provisions in the forest plan.  Indeed, the Federal Defendants are correct

that the Forest Service possesses a degree of discretion over the implementation of some of the

guidelines in the plan.  See Lamb v. Thompson, 265 F.3d 1038, 1049-50 (10th Cir. 2001)

(holding that Forest Service reasonably interpreted raptor habitat acreage requirement of forest

plan as not immediately binding, and therefore, Service's approval of timber sale alternative that

would result in less raptor nesting habitat than other alternatives, but which would further other

multi-use objectives, was not arbitrary and capricious).  However, the Forest Service's duty to

follow the NFMA's consistency requirement is not itself wholly discretionary.  See Southern Utah

Wilderness Alliance v. Norton, 301 F.3d 1217, 1228 (10th Cir. 2002) (finding that, although

courts must give deference to agency's interpretation of its own mandate, obligation itself is not

wholly discretionary).

This Court does not dispute that the Forest Service is required to balance many standards

in the LNFP and that the Forest Service will not be able to meet every standard in the plan at all

times.  In this case, however, the record does not show that in issuing the 1999 permit to the

SGA the Forest Service actively and explicitly balanced, on the record, the provisions of the

38

LNFP.  See Lamb, 265 F.3d at 1050 (finding Forest Service's balancing of multi-use and diversity requirements of forest plan reasonable where Service actively and explicitly balanced, on the record, forest plan provisions and timber sale alternatives).  The record is devoid of any discussion by the Forest Service of any competing provisions in the LNFP that conflict with the plan's goal of bringing grazing use in balance with forage allocation.  Moreover, unlike Lamb, the record does not show that the Forest Service chose to issue the 1999 permit because it best met the multi-use and diversity requirements of the forest plan as opposed to other grazing alternatives.  Instead, the record reflects that the Forest Service considered the effects of an alternate grazing permit that would allow 412 cattle and 5 horses on the summer range and 335 cattle and 5 horses on the winter range.  PI AR 60 at 2 (September 1999 BA).  The Forest Service determined that the issuance of this alternate grazing permit was "likely to adversely affect" the MSO.  Id. at 23.  Despite the findings of the September 1999 BA, the Forest Service did not go forward with a new permit reducing the numbers of livestock.  Rather, on November 23, 1999, the Forest Service issued a 10-year term grazing permit for the Sacramento Allotment that continued to allow the SGA to graze 553 cattle year-round.  PI AR 63 at 1.  The Forest Service gave no explanation in the record for why it chose to issue the 1999 permit instead of issuing a grazing permit with the lower cattle numbers suggested in the September 1999 BA.  The Forest Service cannot avoid its consistency duty under the NFMA by hiding behind its discretion to balance the competing provisions of the forest plan when the record shows that the Forest Service did not even engage in this "highly complex" balancing process when deciding to issue the 1999 permit.  Therefore, the Forest Service was required to issue a grazing permit for the Sacramento Allotment that was consistent with the LNFP's goal of bringing grazing use into

balance with forage allocated for use by domestic livestock and with the 1996 Amendment standards and guidelines to protect the MSO by not allowing grazing to exceed forage use levels.

The Federal Defendants do not point to any evidence in the record to show that the 1999 permit terms were consistent with the LNFP's goal of bringing livestock numbers in balance with allocated forage or with the 1996 Amendment standards and guidelines of protecting threatened and endangered species by not exceeding forage use levels.  In fact, the record indicates that the 553 head of livestock allowed by the 1999 permit were not in balance with the forage allocated for use by domestic livestock.  See AR 10 at 9, 21 (1996 production utilization study finding that Sacramento Allotment "is currently an overstocked allotment" and recommending a reduction in livestock); PI AR 43 at 26 (1998 report by Dr. Galt and Dr. Holechek concluding that "the Sacramento Allotment has inadequate grazing capacity for the present number of permitted cattle (553 AU's)"); AR 69a at 3 (1999 winter range analysis determining that range conditions are on downward trend due to over-utilization); PI AR 120 at 1 (October 18, 2000 letter by District Ranger stating that winter carrying capacity of Sacramento Allotment is 330 cattle).  Specifically, the record shows that the grazing of 553 cattle did not maintain range conditions at a level that assured the recovery of the threatened MSO.  See id.; PI AR 83 at 1 (May 8, 2000 letter providing for amended AOIs for Sacramento Allotment because monitoring of forage utilization in 1998 showed an average 80% utilization, far exceeding 35% allowable use, and because residual plant residue was below what was required for MSO prey).

The Forest Service, however, argues that the 2000 AOIs amended the 1999 permit terms, reducing livestock numbers on the Sacramento Allotment and making the permit terms consistent with the forest plan goals and standards.  Indeed, the NFMA requires that grazing permits

40

"currently in existence shall be revised as soon as practicable to be made consistent with [land management plans]."  16 U.S.C. § 1604(i).  However, utilizing AOIs to reduce livestock numbers is not sufficient to make the entire 1999 term permit consistent with the LNFP because AOIs only modify the term grazing permit for one year.  The entire term permit itself must be revised to satisfy the NFMA's consistency requirement.  In this case, the 1999 grazing permit was not revised to make it consistent with the LNFP's goal of bringing grazing use into balance with forage allocated for use by domestic livestock, or with the 1996 Amendment standards and guidelines to protect threatened and endangered species by not allowing grazing to exceed forage use levels.  Therefore, this Court concludes that the Forest Service violated the NFMA.

        D.      **Relief**

      The Court has found violations of both the ESA and the NFMA.  Both violations constitute "agency action unlawfully withheld or unreasonably delayed" under Section 706(1) of the APA, and this Court has no choice but to compel such action.  See Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999).  The Federal Defendants argue that an order compelling compliance with the consistency requirement of the NFMA is not appropriate because determining whether the 1999 term grazing permit is consistent with the LNFP is a complex, technical process.  Although the Federal Defendants correctly point out that mandamus relief is proper only where the act to be ordered is purely ministerial and does not require the exercise of executive discretion, Marquez-Ramos v. Reno, 69 F.3d 477, 479 (10th Cir. 1995), "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform," Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991).  Thus, a court can compel the agency to exercise its discretion, without dictating how that

discretion must be exercised.  Id. at 501-02; Yu v. Brown, 36 F.Supp.2d 922, 931 (D.N.M.

1999).  As this Court has already determined that the Forest Service violated its clear statutory

duty to ensure that the 1999 term grazing permit was consistent with the LNFP, this Court may

require the Forest Service to exercise its discretion to revise the 1999 term grazing permit to

ensure the permit's consistency with the LNFP and the 1996 Amendment.

Forest Guardians seeks additional relief in the form of an injunction against any grazing on

the Sacramento Allotment until the Federal Defendants have complied with their duties under

both the ESA and the NFMA.  This request for relief will be denied.

Federal courts are not obligated to issue an injunction automatically for every violation of

the ESA.  Southwest Center for Biological Diversity v. United States Forest Service, 307 F.3d

964, 971 (9th Cir. 2002); National Wildlife Fed'n v. Burlington Northern R.R., 23 F.3d 1508,

1511 (9th Cir. 1994) (citing Tennessee Valley Authority v. Hill, 437 U.S. 153, 193 (1978)).  The

test for determining if an injunction should be issued is whether the injunction is necessary to

achieve the congressional purpose underlying the Act.  Southwest Center, 307 F.3d at 971-72;

see also Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 544 (1987) (noting

that courts, when deciding whether to issue injunction, should focus on underlying substantive

policy the procedure was designed to effect, rather than simply blindly adhering to statutory

procedure).  In the ESA, Congress' underlying policy is to prevent further injury to threatened

and endangered species and to promote species' recovery.  Injunctive relief under the ESA is

therefore generally mandated where the moving party (1) has shown a likelihood of success on the

merits and (2) has demonstrated irreparable injury.  Southwest Center 307 F.3d at 972.

This Court has already concluded that the Forest Service and FWS did not properly complete consultation on the issuance of the 1999 term grazing permit.  Hence, Forest Guardians has fulfilled the "success on the merits" requirement.  In regard to the showing of "irreparable injury," Forest Guardians contends that where, as here, there is a Section 7 procedural violation of the ESA, irreparable harm automatically is established and the Court must enjoin the activity.  Indeed, Forest Guardians is correct that substantial procedural violations of the ESA mandate an injunction of the project pending ESA compliance.  See Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985).  The Ninth Circuit, however, has carved out a narrow exception to the injunction requirement for non-jeopardizing agency action.  See Southwest Center, 307 F.3d at 973.

In Southwest Center, the Ninth Circuit reviewed the district court's denial of an injunction to halt livestock grazing during the ESA Section 7 consultation process, even though the district court ruled that the Forest Service had never completed consultation on the grazing allotments.  See id. at 970-71.  Despite the plaintiffs' insistence that injunctive relief was mandatory, the Ninth Circuit upheld the district court's refusal to enjoin grazing.  See id. at 974.  The Ninth Circuit noted that Congress intended the consultation process to prevent substantive violations of the Act.  Id. at 973.  While the Section 7(a) consultation process was ongoing, Section 7(d) provided protections for the species by prohibiting the "irreversible or irretrievable commitment of resources."  Id.  Therefore, the Ninth Circuit held that "*non-jeopardizing* agency action may take place during the consultation process in light of the protections of Section 7(d) where the action will not result in substantive violations of the act."  Id.

In affirming the district court's decision to deny injunctive relief, the Ninth Circuit noted that there was evidence in the record that enabled the court to review the impact on the species

43

during the consultation process.  Id.  This included evidence of mitigating measures taken by the

Forest Service and of improved conditions on the allotment indicating that the species was not

likely to be harmed during the consultation period.  Id.  Moreover, the Ninth Circuit concluded

that there were no irreversible commitments of resources that would foreclose reasonable and

prudent alternatives to protect the species in the interim.  Id.

This case is akin to Southwest Center.  Here, as in Southwest Center, there is evidence in

the record for this Court to review the impact of continued grazing on the MSO during the

consultation process.  The November 2000 BA analyzed the effects on the MSO of the grazing of

200 to 412 head of cattle on the summer range and of 250 head of cattle on the winter range over

a three-year period, as dictated by the amended 2000 AOIs.  FWS AR at 2; PI AR 102 at 1-2.

Although the November 2000 BA does not satisfy the Forest Service's consultation duties, the

November 2000 BA does supply sufficient evidence for this Court to conclude that the MSO is

not likely to be harmed during the consultation period.

The November 2000 BA determined that the grazing of 200 to 412 cattle on the

Sacramento Allotment for a three-year period is "not likely to adversely affect" the MSO.  Id. at

11.  The FWS concurred with this finding on February 2, 2001.  FWS AR 5.  Nonetheless, Forest

Guardians argues that the November 2000 BA's finding is incorrect and that the grazing of 200 to

412 cattle is likely to adversely affect the MSO.  As support, Forest Guardians points to the

September 1999 and April 2000 BAs, which examined the effects on the MSO of grazing 412

cattle on the summer range and 335 cattle on the winter range.  Both the September 1999 and

April 2000 BAs concluded that the grazing levels were "likely to adversely affect" the MSO. PI

AR 60 at 23; PI AR 73 at 8.  Moreover, Forest Guardians notes that the FWS refused to concur

with the August 2000 BA, in which the Forest Service determined that the grazing of 200 to 412 cattle was "not likely to adversely affect" the MSO.  FWS AR 10 at 2.  Despite the apparent inconsistencies between the previous BAs, this Court determines that the November 2000 BA provides sufficient evidence that the grazing of 200 to 412 head of cattle is not likely to harm the MSO during the consultation period.

Unlike in the previous BAs conducted on the Sacramento Allotment, the November 2000 BA indicates that, just as in Southwest Center, the Forest Service is taking mitigating measures to ensure that cattle grazing on the Sacramento Allotment will have little, if any, impact on the MSO during consultation.  The November 2000 BA, in contrast to the prior BAs, contains an extensive explanation of the Forest Service's proposed monitoring schedule for the Sacramento Allotment, provides for an additional monitoring period, includes management actions to be implemented during drought conditions, discusses in detail the Ward study and the reasons for the use of the 4-inch stubble height requirement, and shows improved range conditions from monitoring conducted in July and August 2000.  FWS AR 9 at 2-4, 8-10.

In order to address the chronic overgrazing that plagued the Sacramento Allotment in previous years, in the November 2000 BA, the Forest Service provides for an additional monitoring period (for a total of three) for the winter range in order to ensure that the stubble height requirements are being met.  See id. at 3.  Initial monitoring in September through October will enable the Forest Service to decide what stocking level should be permitted on the winter range.  Id.  For the summer range, the Forest Service includes monitoring in April in order "to predict [that] adequate growth can occur to produce 4" of growth by 10 days after the start of the rains."  Id.  The Forest Service stated that stocking levels for entry into the summer pastures

45

would be based on whether the 4-inch ground cover height requirement was expected to be met during the July/August monitoring period.  Id.  The Forest Service determined that the allowed use level would also maintain the 4-inch requirement in September and October.  Id.  These monitoring measures will ensure that the 4-inch stubble height requirement is continually met throughout the year, which will protect the MSO.[16]

Additionally, the November 2000 BA includes a section entitled "Management Options/Drought Contingency Plan."  Id. at 4.  This section indicates that the Forest Service will make certain that specific management actions are implemented through amendments to the AOIs to protect resources if drought conditions or monitoring indicates that the herbaceous cover height and forage utilization are not at the proper levels.  Id.  The management plan for drought conditions includes moving livestock or reducing livestock numbers.  Id.

The November 2000 BA also demonstrates that sufficient ground cover will be present for the vole on the Sacramento Allotment, and addresses the FWS's concern that the proposed 4-inch cover height standard was imposed only during the months of July and August.  The Forest Service explained that it applied the 4-inch cover requirement to the July and August time period because those were the two months in which Mr. Ward conducted his study.  Id.  The agency noted, "We currently do not know the ground cover requirement for meadow dependent species during the other months of the year since no studies have been conducted outside of July and

---

[16]In fact, monitoring results from July 18-20, 2000, showed that the 4-inch height requirement was not being met.  See PI AR 102 at 1.  The Forest Service applied corrective measures by reducing the livestock numbers on the allotment.  Id. at 1-2.  Consequently, monitoring results from both July and August indicated that the 4-inch requirement was being met, demonstrating the efficacy of more frequent monitoring on the maintenance of the 4-inch height standard.  See FWS AR 9 at 9.

August."  Id.  Despite the lack of studies conducted outside of July and August, the Forest

Service discussed its reasons for finding adequate rodent cover during the other months of the

year.  Id.  In regard to the May and June period, Mr. Ward relayed, by personal communications

to the Forest Service, that the cover height requirements for rodents in May and June might be

less than the height requirements needed in July and August, due to climatic factors that influence

vole numbers.  Id.  Furthermore, the Forest Service pointed out that the combination of early-

growing non-palatable species, key forage species cover, other palatable species cover, and the

65% residual from the previous year was sufficient to provide adequate cover for prey species in

May and June.  Id. at 9.  For the September to October period, the Forest Service determined that

the 4-inch height standard coupled with non-palatable species cover would provide adequate prey

cover.  Id.  As for the late fall and winter months, the Forest Service concluded that the 65%

residual amount would provide adequate prey cover, especially given that snow serves as

additional cover for prey species during the winter months.  Id.  The Forest Service also noted

that prey cover on the winter range was not a concern because the two PACs located on the

winter range are not accessible to livestock because of steep slopes and rocky terrain.  Id.  This

evidence demonstrates that the 4-inch stubble height requirement can be maintained throughout

the year, especially in light of the additional monitoring of the allotment.

　　　Forest Guardians argues that the Ward study, upon which the 4-inch cover standard is

based, does not support the Forest Service's conclusion that the 4-inch cover height will provide

sufficient prey for the MSO.  Indeed, Mr. Ward admitted in his declaration that "it cannot be

demonstrated at this time what influence a 4-inch stubble height will have on this population of

Mexican spotted owls."  PI AR 113 at 7.  Mr. Ward explained that the relationship between

numbers of Mexican voles and the needs of the MSO "is complex and has yet to be fully

quantified." Id. at 6.

Although the Ward study did not analyze the direct effects of the 4-inch cover height on

the MSO, the Ward study is the best available scientific data on the effects of cover height on

the numbers of Mexican voles. The Ward study determined that a 4-inch herbaceous ground cover

height corresponded to approximately 50 voles per acre, resulting in approximately 83,250 voles

within the 1,665 acres of meadow habitat on the Sacramento Allotment. FWS AR 9 at 8. These

data support this Court's conclusion that the maintenance of a 4-inch cover height requirement is

not likely to harm the MSO during the consultation process. Further support is provided by

evidence of the abundance of other MSO prey found on the Sacramento Allotment. See PI

AR106 at 6-7 ("[The] expected use and the retention of down woody debris should allow for both

variety and maintenance of prey biomass within mixed conifer habitats and proposed critical

habitat. Total prey biomass, which is more influential on the owl's fitness than the abundance of

any particular prey species, is expected to be maintained in both meadow and mixed conifer areas

within this allotment."); FWS AR 9 at 8 ("Rodent prey cover . . . within PACs, Mixed [sic]

conifer habitats, and the primary constituent elements for critical habitat, appears to be intact and

functioning well for rodent prey species using these areas."); see also PI AR 113 at 5 (voles

account for merely 10% to 12% of the MSO's dietary biomass).

Additionally, the protections of Section 7(d) will ensure that continued grazing of 200 to

412 head of cattle on the summer range and 250 head of cattle on the winter range does not result

in substantive violations of the ESA during the consultation process. In this case, as in Southwest

Center, there are no irreversible commitments of resources that "would foreclose reasonable and

48

prudent alternatives . . ." pending the conclusion of consultation.  Southwest Center, 307 F.3d at

973.  As the Ninth Circuit explained:

> Livestock grazing is flexible and can be altered during the process if necessary.
> This case is not one where once the action is initiated there can be no turning back,
> as in a case where timber is cut, or wherein the action will unquestionably make it
> unlikely that the species will survive, such as in *Tennessee Valley Authority*.

Id. (citation omitted).  Here, the requirements of Section 7(d) will vindicate the objectives of the

ESA, so an injunction is not necessary.  See Amoco Production Co., 480 U.S. at 543 n.9

(distinguishing TVA v. Hill and noting that in TVA only an injunction could vindicate the

objectives of the ESA); Loggerhead Turtle v. County Council of Volusia County, Florida, 896

F.Supp. 1170, 1180-81 (M.D. Fla. 1995) (refusing to issue an injunction where there was not a

reasonable likelihood that the defendant would commit future violations of the ESA).

In conclusion, the continued grazing of 200 to 412 head of cattle on the summer range and

250 cattle on the winter range on the Sacramento Allotment constitutes a non-jeopardizing

agency action that may take place during the consultation process.[17]  Therefore, this Court will

deny Forest Guardians' request to enjoin grazing on the Sacramento Allotment pending the

completion of the Federal Defendants' duties under the ESA and NFMA.

## V.    Discussion of the SGA's Appeal

In its appeal, the SGA challenges a number of decisions by the Forest Service.  First, the

SGA alleges that the Forest Service wrongfully excluded the Dry and Davis Allotments from the

---

[17]As was last indicated to this Court, only 330 head of cattle were permitted on the
Sacramento Allotment, which was well within the range of 200 to 412 head that constitutes non-
jeopardizing agency action.  During consultation, this Court will leave to the Forest Service's
discretion the precise number of cattle within the 200 to 412 range needed to maintain the 4-inch
standard on the Sacramento Allotment.

Sacramento Allotment.  Second, the SGA contends that the Forest Service acted arbitrarily and capriciously and violated the SGA's due process rights in ordering the 125-head and 98-head reductions in the SGA's herd.  Third, the SGA argues that the Forest Service acted arbitrarily and capriciously in ordering the SGA to reduce its livestock numbers by 40% in response to the SGA's refusal to comply with the order to reduce its herd by 98-head.  Finally, the SGA requests that this Court order a reduction in the number of elk permitted to graze on the Sacramento Allotment.[18]  The Court finds no merit in any of these claims.

A.    **Alleged Exclusion of the Dry and Davis Allotments**

In its first claim for relief, the SGA asserts that the Forest Service excluded the Dry and Davis Allotments from the Sacramento Allotment in violation of the APA and the Due Process Clause.[19]

1.    **Administrative Procedures Act**

The SGA alleges that the Forest Service wrongfully excluded the Dry and Davis Allotments from the Sacramento Allotment.  The Federal Defendants assert that the SGA's first cause of action is barred by the six-year statute of limitations for claims against the United States.  Additionally, the Federal Defendants contend that this claim is moot because the SGA prevailed in its administrative appeal of the exclusion of the Dry and Davis Allotments.  Finally, the Federal

---

[18]This Court previously dismissed with prejudice the SGA's third claim for relief (Doc. No. 162) and sixth claim for relief (Doc. No. 123).

[19]The SGA also asserts in its "First Claim for Relief" that the Forest Service violated the Federal Land Policy Management Act and the Equal Protection Clause in refusing to allow the SGA to graze the Dry and Davis Allotments.  These claims, however, were not raised in the SGA's opening brief, and thus, should be dismissed.  See Coleman v. BG Maintenance Mgmt. of Colorado, 108 F.3d 1199, 1205 (10th Cir. 1997).

Defendants argue that the SGA's challenge of the Forest Service's decision prohibiting the SGA from grazing the Dry and Davis Allotments until the NEPA analysis is completed is unripe for judicial review.

a.        **Statute of Limitations**

A civil action against the United States is barred unless the complaint is filed within six years after the right of action first accrues.  28 U.S.C. § 2401(a).  The six-year limitations period in Section 2401(a) applies to civil actions brought under the APA.  Wind River Mining Corp. v. United States, 946 F.2d 710, 713 (9th Cir. 1991); Ayers v. Espy, 873 F.Supp. 455, 463 (D. Colo. 1994).  As the SGA's claims are brought under the APA, there is no question that the six-year statute of limitations applies to this case.  The issue is at what point the SGA's cause of action challenging the alleged exclusion of the Dry and Davis Allotments first accrued.

The Federal Defendants argue that the SGA's cause of action first accrued when the SGA knew or should have known of its alleged injuries.  The Federal Defendants contend that the SGA knew or should have known of the controversy surrounding the exclusion of the Dry and Davis Allotments when the 1989 permit was issued to the SGA.  The Federal Defendants, however, have applied the wrong standard for determining when the SGA's cause of action first accrued.

Under the APA, a right of action first accrues at the time of the "final agency action."  See 5 U.S.C. § 704; Southwest Williamson County Cmty. Ass'n, Inc. v. Slater, 173 F.3d 1033, 1036 (6th Cir. 1999); Wind River, 946 F.2d at 716 ("The right to bring a civil suit challenging an agency action accrues 'upon the completion of the administrative proceedings.'") (quoting Crown Coat Front Co. v. United States, 386 U.S. 503, 511 (1967)); Ayers, 873 F.Supp. at 463.  In determining whether an agency action is final, the court must determine whether the agency has

51

completed its decision-making process and when the agency action will directly affect the parties. Franklin v. Massachusetts, 505 U.S. 788, 797 (1992).

The Federal Defendants are unable to point to any final agency action on the Forest Service's decision to exclude the Dry and Davis Allotments from the Sacramento Allotment that occurred outside the six-year statute of limitations. In this case, the only documented final agency action occurred shortly before the SGA filed suit. District Ranger Max Goodwin issued his written decision on the exclusion of the Dry and Davis Allotments in the July 6, 1999 and August 24, 1999 letters to the SGA. In these two letters, District Ranger Goodwin explained his decision that the Dry and Davis Allotments were not part of the present Sacramento Allotment. DD AR 68, 72. The SGA exhausted the administrative appeals process for challenging District Ranger Goodwin's decision, which culminated in a second level of review by Deputy Regional Forester James Gladen. DD AR 126 and 127. On June 26, 2000, after reviewing the record, Mr. Gladen concluded that it was "not possible to determine with reasonable certainty that the Sacramento Grazing Association does or does not have a legitimate claim to graze the Dry and Davis Pastures (Allotments)." DD AR 128 at 2. Nonetheless, Mr. Gladen instructed the District Ranger to consider the Dry and Davis Allotments in the current NEPA analysis for authorization of grazing on the Sacramento Allotment. Id. Mr. Gladen, however, prohibited the SGA from grazing the Dry and Davis Allotments during the interim period while the NEPA analysis was being completed because the SGA had never before grazed the Dry and Davis Allotments. Id.

The Federal Defendants contend that a final decision excluding the Dry and Davis Allotments from the Sacramento Allotments occurred sometime prior to 1985, and no later than 1989, the year the SGA first acquired its ten-year grazing permit and was not allowed to use the

52

Dry and Davis Allotments.  The Federal Defendants argue that District Ranger Goodwin's July 6, 1999 and August 24, 1999 letters simply explained the Forest Service's long-standing position that livestock grazing on the Dry and Davis Allotments was not authorized by the 1989 Sacramento permit.

The Federal Defendants' argument, however, is without merit.  Although there are documents in the record indicating that at some point a decision may have been made to exclude the Dry and Davis Allotments from the Sacramento Allotment,[20] there is an absence in the record of a written decision by the Forest Service clearly excluding the Dry and Davis Allotments from the Sacramento Allotment prior to District Ranger Goodwin's July 6, 1999 decision.  In fact, Mr. Gladen concluded that "there is incomplete documentation of grazing permit administrative actions dating back as far as 1983."  DD AR 128 at 2.  Given the lack of evidence that the Forest Service ever rendered a written, final decision on the status of the Dry and Davis Allotments prior to Mr. Gladen's review decision issued on June 26, 2000, this Court concludes that the six-year statute of limitations under Section 2401(a) does not bar the SGA's claim that the 1989 permit for the Sacramento Allotment includes the Dry and Davis Allotments.

b.    **Mootness**

The Federal Defendants next contend that Deputy Regional Forester Gladen's decision ordering that the Dry and Davis Allotments be considered in the pending NEPA process for authorization of grazing on the Sacramento Allotment mooted the question of whether the Dry and Davis Allotments have been historically part of the permit for the Sacramento Allotment.

---

[20]See e.g., DD AR 26 (1984 grazing permit acquired by the Ruidoso Land Company that did not, on its face, include a reference to the Dry and Davis Allotments); DD AR 28 (1984 map of Sacramento Allotment that did not include Dry and Davis Allotments).

This Court agrees.  "A case is moot when the issues it presents are no longer live, or the parties lack a legally cognizable interest in the outcome."  See Los Angeles County v. Davis, 440 U.S. 625, 631 (1979).  As the Tenth Circuit noted, "There is no point in ordering an action that has already taken place."  Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 729 (10th Cir. 1997).

Deputy Regional Forester Gladen's June 26, 2000 review decision effectively determined that the Dry and Davis Allotments are part of the Sacramento Allotment.  In his decision, Mr. Gladen stated, "[B]y copy of this decision the District Ranger is instructed to consider the Dry Canyon and Davis Pastures (Allotments) in the current NEPA analysis for authorization of grazing on the Sacramento Allotment."  DD AR 128 at 2.  Mr. Gladen added, "This will be consistent with the special terms and conditions as stated in Part 3 of the term grazing permit issued to the Sacramento Grazing Association."  Id.  The special terms and conditions in Part 3 of the grazing permit adopted the terms of the April 22, 1980 AMP, which included the Dry and Davis Allotments among the allotments to be managed under the permit for the Sacramento Allotment.  Id.  Thus, the SGA prevailed in its appeal challenging the exclusion of the Dry and Davis Allotments from the Sacramento Allotment.  There is no point in this Court ordering that the Dry and Davis Allotments be included in the Sacramento Allotment as that action has already taken place.  Hence, the SGA's challenge to the exclusion of the Dry and Davis Allotments is moot.

c.      **Prohibition against Interim Grazing on the Dry and Davis Allotments**

Despite the fact that the SGA prevailed on its claim that the Dry and Davis Allotments should be part of the Sacramento Allotment, the SGA contends that Mr. Gladen's decision not to allow the SGA to graze the Dry and Davis Allotments while a NEPA analysis is conducted effectively denies the SGA its lawful access to the Dry and Davis Allotments, and thus, is arbitrary and capricious.  The SGA urges this Court to enjoin the Forest Service from denying the SGA access to the use of the Dry and Davis Allotments.

This Court, however, is unable to grant the SGA the relief it requests as the SGA's challenge of the Forest Service's decision not to permit the SGA to graze the Dry and Davis Allotments until the NEPA analysis is completed is unripe for judicial review.  In determining whether an APA claim is ripe for review, a court must consider four factors:  (1) whether the issues in a case are purely legal; (2) whether the agency action is "final agency action" within the meaning of the APA; (3) whether the action has or will have a direct and immediate impact upon the plaintiff; and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.  Mobil Exploration & Producing U.S., Inc. v. Dep't of the Interior, 180 F.3d 1192, 1197 (10th Cir. 1999).  In this case, although Mr. Gladen's decision constituted final agency action on whether to include the Dry and Davis Allotments as part of the Sacramento Allotment, Mr. Gladen's decision did not address the allowable level of grazing on the Dry and Davis Allotments.  Mr. Gladen merely made an interim decision that the SGA should not graze the Dry and Davis Allotments until the NEPA analysis is completed and the grazing capacity and environmental effects of grazing the Dry and Davis Allotments can be determined.  See Mobil

55

Exploration, 180 F.3d at 1198 (holding that document request letter "constituted no more than 'a threshold determination that further inquiry [was] warranted'") (quoting FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 241 (1980)). As soon as the environmental consequences of grazing the allotments are known, the Forest Service will make its final decision as to what extent the SGA can graze the Dry and Davis Allotments.  This Court is not in a position to analyze whether or not the SGA should be able immediately to graze the Dry and Davis Allotments precisely because the NEPA analysis is not completed and there is no administrative record before this Court that shows the environmental consequences of grazing the Dry and Davis Allotments.  Therefore, the Forest Service's interim decision not to allow the SGA to graze the Dry and Davis Allotments pending NEPA completion is unripe for judicial review.

Moreover, even if the Forest Service's interim decision was ripe for review, the SGA has failed to show that the decision was unreasonable.  According to the terms of the SGA's 1999 permit to graze the Sacramento Allotment, the permit can be modified at any time to conform with needed changes brought about by law.  PI AR 63 at 1.  The Forest Service must conduct NEPA analyses for allotment management plans and for the issuance and reissuance of term grazing permits.  See Forest Guardians v. Veneman, No Civ. 01-138 TUC-DCB, slip op. at 14 (D. Ariz. Oct. 28, 2002); PI AR 39 at 2.  NEPA requires federal agencies to take a "hard look" at potential environmental consequences of proposed projects before taking action.  Price Road Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp., 113 F.3d 1505, 1509 (9th Cir. 1997).

Here, the Forest Service issued a final decision that called for the inclusion of the Dry and Davis Allotments within the Sacramento Allotment, thereby subjecting the Dry and Davis Allotments to the 1999 term permit for the Sacramento Allotment and requiring the Forest

Service to take a hard look at the potential environmental effects of proposed grazing on the Dry and Davis Allotments. A NEPA analysis is therefore necessary in order to determine the proper number of livestock that can be allowed to graze the Dry and Davis Allotments without causing any irreversible or irretrievable commitments of resources that might adversely affect the MSO. The need to conduct a NEPA analysis is especially justified here in light of the documented history of overgrazing on the Sacramento Allotment. Thus, the Forest Service acted reasonably and did not abuse its discretion under 5 U.S.C. § 706 in waiting until the NEPA process is completed before allowing grazing to occur on the Dry and Davis Allotments.

In sum, the SGA's claim concerning the exclusion of the Dry and Davis Allotments from the Sacramento Allotment is moot. The SGA's challenge to the Forest Service's decision not to allow the SGA to graze the Dry and Davis Allotments pending the completion of the NEPA analysis is unripe for judicial review, and even if it were ripe, the Forest Service's decision was reasonable. Hence, the SGA's "First Claim for Relief" should be dismissed.

2.    <b>Due Process</b>

Additionally, the SGA asserts in its first claim for relief that the removal of the Dry and Davis Allotments from the Sacramento Allotment violated the Due Process Clause. Even assuming that the SGA's claims were not moot and the Forest Service did exclude the Dry and Davis Allotments, the SGA's due process claims should be dismissed.

A due process analysis consists of two steps. The first step is to determine whether the plaintiff has a property or liberty interest protected by the Fourteenth Amendment. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972). If a property or liberty interest is identified, the

second step is to determine whether the defendant deprived plaintiff of that interest without due process.  Russo v. White, 775 F.Supp. 639, 644 (S.D.N.Y. 1991).

The SGA lacks a property interest in the terms and conditions of its grazing permit. Under federal law, permits do not convey "any right, title, interest, or estate in any public lands or resources." 43 U.S.C. § 1752(h); 36 C.F.R. § 222.3(b).  A grazing permit gives the permittee merely a license to use federal land, not a vested right in the land.  Federal Lands Legal Consortium, 195 F.3d at 1196.  The Tenth Circuit held that permittees do not have a property interest in the terms and conditions of grazing permits where, as here, the Forest Service retains discretion to change the permit terms and conditions.  See id. at 1200.

Moreover, even if the SGA did have a property interest in the Dry and Davis Allotments, the procedures afforded to the SGA by the Forest Service were sufficient to satisfy procedural due process.  The extensive appeals process, as provided in 36 C.F.R. §§ 251.80 to 251.103, was sufficient to avoid any risk of erroneous deprivation of the SGA's interest in the terms and conditions of its 1989 and 1999 grazing permits.[21]  Consequently, the SGA's due process claim based on the Forest Service's denial of the SGA's use of the Dry and Davis Allotments should be dismissed.

---

[21]The SGA makes numerous claims of unlawful conduct during the intermediate level of review, specifically that conducted by Forest Supervisor Jose Martinez, who upheld District Ranger Goodwin's exclusion of the Dry and Davis Allotments.  These claims are meritless at best, and frivolous at worst.  The record shows that Forest Supervisor Martinez acted lawfully and within his discretion during all stages of the appeals process.  The SGA also failed to demonstrate that it was prejudiced by any of the alleged unlawful acts.  Moreover, the SGA was ultimately successful at the next level of review before Deputy Regional Forester Gladen in getting the Forest Service to consider the Dry and Davis Allotments as part of the Sacramento Allotment.

B.      **125-Head and 98-Head Reductions of the SGA's Herd**

In the SGA's second cause of action, the SGA asserts various unlawful acts of the Forest

Service stemming from the Forest Service's May 8, 2000 and August 2, 2000 decisions to reduce

the number of livestock the SGA was permitted to graze on the Sacramento Allotment.  The

Federal Defendants contend that the SGA admittedly failed to exhaust its administrative remedies

as to both reductions, and thus, the SGA's claims regarding the reductions of its herd should be

dismissed.  The Federal Defendants also argue that the Forest Service's orders reducing the

number of livestock the SGA was permitted to graze were lawful.

1.      **Exhaustion**

On May 8, 2000, District Ranger Goodwin sent the SGA a copy of his written decision to

amend the 2000 AOIs for the Sacramento Allotment to reduce the permitted livestock numbers

for the summer grazing season from 553 cattle to 428 cattle.  PI AR 83.  The SGA appealed the

May 8, 2000 decision by submitting a notice of appeal and request for a stay to both Forest

Supervisor Martinez and Regional Forester Eleanor Towns.  PI AR 87.  On May 26, 2000,

Deputy Regional Forester Gladen sent the SGA a letter informing the SGA that it could not file

an appeal with the Regional Forester until the Forest Supervisor rendered a decision.  SGA's

Exhibits (Doc. No. 194), Ex. 11.  Forest Supervisor Martinez denied the SGA's request for a stay

of District Ranger Goodwin's May 8, 2000 decision.  PI AR 90.  On June 1, 2000, Deputy

Regional Forester Gladen upheld Forest Supervisor Martinez's denial of the stay.  PI AR 94.

Subsequently, on June 13, 2000, Acting District Ranger Brad Orr filed a responsive statement in

response to the SGA's appeal.  PI AR 96.   The SGA filed a reply to the responsive statement on

July 6, 2000.  SGA's Exhibits (Doc. No. 194), Ex. 13.  On August 9, 2000, Forest Supervisor

Martinez issued his review decision upholding the reduction of livestock from 553 cattle to 428 cattle in the summer.  Id. at Ex. 12.

Prior to this review decision, on August 2, 2000, Acting District Ranger Ray Kingston ordered an additional reduction of 98 cattle in order to try to meet the 4-inch stubble height requirement.  PI AR 102 at 2.  In response, on August 24, 2000, the members of the SGA wrote a letter to Regional Forester Towns detailing the many alleged wrongful acts of the Forest Service during the appeals process.  PI AR 110.  The letter requested that Regional Forester Towns review the order to remove the additional 98 head of cattle from the Sacramento Allotment.  Id. at 5-6.  The letter also informed Ms. Towns of the SGA's refusal to remove the additional 98 head of cattle.  Id. at 6-7.

In APA cases, if a statute expressly requires exhaustion as a prerequisite to judicial review, then the statute must be enforced.  See Darby v. Cisneros, 509 U.S. 137, 154 (1993); Portela-Gonzalez v. Secretary of the Navy, 109 F.3d 74, 77 (1st Cir. 1997) ("[E]xhaustion of administrative remedies is absolutely required if explicitly mandated by Congress."); Bastek v. Federal Crop Ins. Corp., 145 F.3d 90, 95 (2d Cir. 1998) ("7 U.S.C. § 6912(e) unambiguously required plaintiffs to exhaust their administrative remedies before bringing suit, and their failure to do so deprived them of the opportunity to obtain relief in the district court."); Kleisser v. U.S. Forest Service, 183 F.3d 196, 200 (3d Cir. 1999) (holding that a court cannot review issues that have not been passed on by the agency).

For cases pertaining to actions of the Department of Agriculture, of which the Forest Service is a part, the following statutory exhaustion requirement applies:

> Notwithstanding any other provision of law, a person shall exhaust all
> administrative appeal procedures established by the Secretary or required by law
> before the person may bring an action in a court of competent jurisdiction
> against -- (1) the Secretary; (2) the Department; or (3) an agency, office, officer,
> or employee of the Department.

7 U.S.C. § 6912(e); see also Utah Shared Access Alliance v. Wagner, 98 F.Supp.2d 1323,

1332-33 (D. Utah 2000).  A plaintiff must not only initiate the appeals process, but must pursue

the administrative procedures to the appropriate conclusion and await the final outcome before

seeking judicial review.  Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 767 (1947).

An appellant must properly complete all his administrative remedies – the doctrine of substantial

compliance does not apply.  See Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002)

(holding that inmate must properly complete all grievance procedures and that doctrine of

substantial compliance does not apply to Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)).

Under the Forest Service regulations, the appeal of a grazing permit administrative

decision requires two levels of review:  the initial review is filed with the Forest Supervisor; the

second level of review is filed with the Regional Forester within 15 days of the first level appeal

decision.  36 C.F.R. § 251.87(c).  "A Regional Forester's decision on a second-level appeal

constitutes the final administrative determination of the Department of Agriculture on the appeal."

Id. § 251.87(e).

Both the May 8, 2000 decision, reducing the permitted number of livestock to graze the

Sacramento Allotment by 125 head, and the August 2, 2000 decision, reducing the allowed

number of livestock by an additional 98 head, are decisions subject to administrative appeal.  See

36 C.F.R. § 251 et seq.  Although the SGA initiated the administrative appeal process for the

reduction in 125 head of cattle, the SGA failed to complete the appeals process by filing a notice

61

of appeal of Forest Supervisor Martinez's review decision with the Regional Forester.  See id.

§ 251.87(c). The Regional Forester's decision, not Forest Supervisor Martinez's decision, is the

final administrative determination of the Forest Service.  See id. § 251.87(e).

 The SGA contends that its August 24, 2000 letter to Regional Forester Towns constitutes

an appeal of the 125-head reduction.  This letter, however, did not constitute an appeal of the

order to reduce the 125 head of livestock from the Sacramento Allotment.  Rather, by its own

terms, the letter could only be considered a request for a reconsideration of the order to remove

the additional 98 head of cattle from the Sacramento Allotment.  See PI AR 110 at 5.  Moreover,

Forest Service regulations required the SGA's notice of appeal to contain necessary information,

such as a brief description and the date of the written decision being appealed; a statement of the

issues raised by the appeal; and specific references to any law, regulation, or policy that the SGA

believed to have been violated.  Id. § 251.90.  The SGA's purported notice of appeal did not

contain this requisite information.  Had the SGA's intention by the letter been to appeal the 125-

head reduction, the SGA should have made that intention plain – as it had in previous appeals.

See PI AR 87; DD AR 75, 126.  Given the SGA's knowledge of the appeals process, this Court

can only conclude that the SGA failed properly to file a notice of appeal of the 125-head

reduction because the SGA had chosen to forego the administrative process and proceed to

federal court.  This conclusion is supported by the SGA's First Amended Complaint, in which the

SGA admits to having failed to exhaust its administrative remedies for both the 125-head and the

62

98-head reductions based on its allegations that proceeding with the administrative appeals would have been futile.[22]  SGA's First Am. Compl. (Doc. No. 72) ¶¶ 24-25.

Having reviewed the record, this Court determines that the SGA failed to exhaust its administrative remedies in regard to the initial 125-head reduction.  Furthermore, the August 24, 2000 letter did not initiate or complete the administrative appeals process for the 98-head reduction in livestock, because the SGA never properly initiated the appeals process for the August 2, 2000 decision, which would have required the SGA to file the initial notice of appeal with the Forest Supervisor, not the Regional Forester.  36 C.F.R. § 251.87(c).  Because exhaustion of administrative remedies is absolutely required when mandated by Congress, the SGA's claims challenging the 125-head and 98-head reductions in its herd must be dismissed.

### 2.    Merits of Reductions

Even if the SGA had exhausted its administrative remedies in its challenge of the 125-head and 98-head livestock reductions, the Court would dismiss the SGA's second cause of action on the merits.

The Court rejects the Federal Defendants' initial assertion that the SGA's claim does not present a cognizable cause of action under the APA because the SGA has not made reference to any underlying statutory requirement.  Section 702 of the APA provides:  "A person suffering *legal* wrong because of agency action, or adversely affected or aggrieved by agency action *within*

---

[22]The SGA did not raise the futility argument in its opening brief, and therefore, the argument is deemed waived.  See Coleman v. BG Maintenance Mgmt. of Colorado, 108 F.3d 1199, 1205 (10th Cir. 1997).  However, even if the SGA did not abandon its futility argument, the SGA has not demonstrated any "structural or systemic failure" in the appeals process so as to excuse the exhaustion requirement.  See Bryan v. Office of Personnel Mgmt., 165 F.3d 1315, 1319 n.4 (10th Cir. 1999) (quoting Urban v. Jefferson County Sch. Distr., 89 F.3d 720, 725 (10th Cir. 1996)).

*the meaning of a relevant statute*, is entitled to judicial review thereof."  5 U.S.C. § 702

(emphasis added).  By its very terms, Section 702 requires reference to other statutes, and thus,

there can be no arbitrary and capricious review absent an independent statute.  Oregon Natural

Resources Council v. Thomas, 92 F.3d 792, 797-98 (9th Cir. 1996).  "As a procedural statute, the

APA does not expand the substantive duties of a federal agency, but merely provides the

framework for judicial review of agency action."  Preferred Risk Mut. Ins. Co. v. United States,

86 F.3d 789, 792 (8th Cir. 1996); Sierra Club v. Martin, 110 F.3d 1551, 1554-55 (11th Cir.

1997).  "Accordingly, there is no right to sue for a violation of the APA in the absence of a

relevant statute whose violation forms the legal basis for the complaint."  Id. (internal quotations

omitted).  In this case, it is clear from the SGA's complaint and briefs that the SGA is challenging

the Forest Service's decision to modify the terms and conditions of the SGA's grazing permit.

The Forest Service's statutory authority to modify the terms and conditions of the SGA's permits

is based on 43 U.S.C. § 1752(a) and 36 C.F.R. § 222.4(a).  Therefore, the SGA has brought a

claim under the APA that this Court may consider.

     To succeed on the merits of its claim, however, the SGA would have to show that the

herd reductions were arbitrary and capricious.  The record shows that the herd reduction orders

were reasonable and supported by the best available science.

     The Forest Service has the authority to modify the terms and conditions of grazing permits

to conform to current situations brought about by changes in law,  regulation, and resource

conditions.  See 36 C.F.R. § 222.4(a).  The terms of the 1999 grazing permit for the Sacramento

Allotment explicitly allow the Forest Service to modify the permit "at any time during the term to

conform with needed changes brought about by law, regulation, . . . numbers permitted or seasons

of use necessary because of resource conditions."  PI AR 63 at 1.  In addition, the 1999 permit

provides, "The number . . . of livestock . . . may be modified when determined by the Forest

Officer in charge to be needed for resource protection."  Id. at 3.

On May 8, 2002, District Ranger Goodwin amended the AOIs for the Sacramento

Allotment because of the overgrazing that was occurring on the Sacramento Allotment, which

was damaging range resources.  See PI AR 83 ("Monitoring data for the summer range on the

Sacramento Allotment has averaged 75% for the 1998 and 1999 summer & fall grazing periods.

These extreme use levels combined with the lack of winter & spring moisture this year have

created a serious situation with regard to the range resource on the Sacramento Allotment.").

District Ranger Goodwin ordered the SGA to reduce its herd by 125 head for the summer grazing

season to protect range resources based on monitoring results showing 80% utilization (well

above the 35% standard), drought conditions, and the need to maintain the 4-inch minimum cover

height standard.  PI AR 83, 93.

On July 18-20, 2000, the Forest Service conducted field monitoring of the summer

pastures on the Sacramento Allotment.  The results showed that the average stubble height for the

monitoring sites was 2.5 inches, well below the minimum 4-inch standard.  PI AR 102.  Based on

these results, Acting District Ranger Kingston ordered an additional 98-head of cattle removed

from the Sacramento Allotment.  Id.

The SGA contends that there is no scientific evidence in the record to support the herd

cuts.  This Court disagrees.  As discussed previously, the Ward study provides the best available

scientific data on the effects of cover height on the numbers of Mexican voles, and in turn, on the

MSO.  See supra.  The Forest Service is not required to rely on conclusive or certain scientific

65

evidence; rather, the Forest Service must use the best evidence available. <u>Greenpeace Action v. Franklin</u>, 14 F.3d 1324, 1336-37 (9th Cir. 1993).  The Ward study indicates that the 4-inch minimum cover height standard will ensure the presence of a substantial population of Mexican voles on the Sacramento Allotment.  By maintaining a population of Mexican voles, the Forest Service may avoid adverse effects to the MSO.  Therefore, the Forest Service's reliance on the 4-inch standard to prevent adverse effects to the MSO is reasonable and supported by substantial evidence in the record.  Moreover, there is other evidence in the record showing the reasonableness of the Forest Service's decisions to reduce the SGA's herd in order to improve resource conditions.  <u>See</u> AR 10 at 9, 21 (1996 production utilization study finding that the Sacramento Allotment "is currently an overstocked allotment" and recommending a reduction in livestock); PI AR 43 (1998 report by Dr. Galt and Dr. Holechek concluding that "the Sacramento Allotment has inadequate grazing capacity for the present number of permitted cattle (553 AU's)"); AR 69a at 3 (1999 winter range analysis determining that the range conditions are on a downward trend due to over-utilization); PI AR 102 (July 18-20, 2000 monitoring results showing an average stubble height of 2.5 inches on monitoring sites in the Sacramento Allotment).

Given the substantial evidence in the record supporting the Forest Service's decisions to reduce the SGA's herd by 125-head and 98-head, the SGA's "Second Claim for Relief" should be dismissed.[23]

C.    **Reduction of Livestock Numbers by 40% for Permit Violation**

Although the SGA complied with the May 8, 2000 order to reduce its livestock by 125-head, the SGA did not comply with the August 2, 2000 order to reduce its livestock by 98-head by August 10, 2002.  PI AR 91, 98, 108.  After the SGA's refusal to comply with the additional 98-head reduction of livestock, on September 8, 2000, Acting District Ranger Kingston determined that the SGA was in violation of its term grazing permit, and consequently, suspended the grazing of 223 head of livestock (40% of term permitted numbers) on the Sacramento Allotment for a period of two years.  PI AR 113a at 1.  Thus, the SGA was only permitted a maximum of 330 head of livestock on the Sacramento Allotment for the next two years.  Id. Acting District Ranger Kingston informed the SGA that the decision to suspend 40% of the SGA's livestock was subject to appeal under 36 C.F.R. § 251.  Id. at 2.  The SGA challenges the 40% herd reduction as being arbitrary, capricious, and not in accordance with law.

The SGA's claim regarding the 40% herd reduction must be dismissed because the SGA failed to exhaust its administrative remedies prior to filing suit.  The SGA admits in its complaint

---

[23]To the extent that the SGA's opening brief can be construed to bring a due process claim challenging the 125-head and 98-head reductions, the SGA's due process claim should also be dismissed.  The Tenth Circuit does not recognize a protected property interest in the terms and conditions of a grazing permit.  Federal Lands Legal Consortium, 195 F.3d at 1200.  Moreover, the SGA's claims in its complaint that the Forest Service violated NEPA, the Federal Land Policy Management Act, the Multiple-Use Sustained Yield Act of 1960, and the Equal Protection Clause should be dismissed as they were not raised in the SGA's opening brief.  See Coleman v. BG Maintenance Mgmt. of Colorado, 108 F.3d 1199, 1205 (10th Cir. 1997).

that it failed to file appeals to challenge the suspension of the SGA's herd by 223 head of cattle. SGA's First Am. Compl. (Doc. No. 72) ¶ 24.   As exhaustion of administrative remedies is absolutely required when mandated by Congress, the SGA's claims challenging the 40% herd reduction must be dismissed.  See supra.

Furthermore, the SGA's challenge to the 40% reduction would fail on the merits.  The Forest Service has the authority to cancel or suspend a grazing permit "for any violation of a grazing regulation or of any term or condition of such grazing permit."  43 U.S.C. § 1752(a). Moreover, 36 C.F.R. § 222.4(a)(2) allows the Forest Service to cancel a grazing permit in the event the permittee refuses to accept modification of the terms and conditions of the existing grazing permit.  The 1999 grazing permit provides that the permit "may be suspended or cancelled, in whole or in part, after written notice, for failure to comply with any of the terms and conditions."  PI AR 63 at 1.  Under the terms of the 1999 grazing permit, the number of livestock could be modified at any time for resource protection.  Id. at 1, 3.  As discussed above, Acting District Ranger Kingston's order to remove an additional 98-head of livestock was based on substantial evidence in the record and was permissible under the terms of the 1999 grazing permit. By refusing to reduce the number of livestock by an additional 98-head, the SGA violated the terms and conditions of its 1999 grazing permit.  After giving the SGA an opportunity to show cause as to why its permit should not be suspended or canceled, the Forest Service had the authority to suspend or cancel the SGA's term grazing permit.  The Forest Service did not act

arbitrarily, capriciously, or unlawfully when it reduced the SGA's livestock numbers by 40%.

Therefore, the SGA's "Fourth Cause of Action" must be dismissed.[24]

D.    **Removal of Elk**

In its "Fifth Claim for Relief," the SGA requests that this Court order a reduction in the number of elk permitted to graze on the Sacramento Allotment. The SGA does not allege that the Forest Service or the New Mexico Game Commission violated any law. Rather, the SGA asks for equitable relief in the form of a reduction in elk numbers should this Court determine that a reduction in the SGA's livestock numbers is required under the ESA or NFMA.

This Court is unable and unwilling to grant the SGA's request for equitable relief. The SGA has pointed to no statute or case law in support of its theory that the grazing of wild elk can be a violation of either the ESA or the NFMA. More importantly, the SGA did not even claim in its complaint that the Forest Service or the New Mexico Game Commission violated the ESA or NFMA. The SGA merely asserts that the elk should be reduced based on some general notion of equity. This Court, however, cannot order the reduction of elk on the Sacramento Allotment because that is a matter completely within the discretion of the New Mexico Game Commission and the Forest Service. See Baca v. King, 92 F.3d 1031, 1037 (10th Cir. 1996) ("No court has the power to order the BLM or the Department of Interior to grant [plaintiff] another grazing lease, because the very determination of whether to renew grazing permits and whether public lands should even be designated for grazing purposes are matters completely within the Secretary

---

[24]The SGA also asserts in its "Fourth Claim for Relief" that the Forest Service violated NEPA, the Federal Land Policy Management Act, the Multiple-Use Sustained Yield Act of 1960, and the Due Process and Equal Protection Clauses. These claims should be dismissed as they were not raised in the SGA's opening brief. See Coleman v. BG Maintenance Mgmt. of Colorado, 108 F.3d 1199, 1205 (10th Cir. 1997).

of Interior's discretion."); <u>Marquez-Ramos v. Reno</u>, 69 F.3d 477, 479 (10th Cir. 1995) (holding

that mandamus relief is proper only where the act to be ordered is purely ministerial and does not

require the exercise of executive discretion); <u>New Mexico State Game Commission v. Udall</u>, 410

F.2d 1197, 1200 (10th Cir. 1969) (noting that wild animals are owned by the state and that the

Secretary of Agriculture has the authority to destroy animals to protect national park property).

Moreover, there is no need to order a reduction in elk, as the New Mexico State Game

Commission, within its discretion and authority, has issued additional elk hunting permits and

intends to reduce the numbers of elk from 4,000 to 1,000 within Unit 34, which includes the

Sacramento Allotment.  State Defs. Resp. (Doc. No. 199) at 5-6.

      In sum, the SGA has failed to state a cause of action that would compel the reduction of

elk within the Sacramento Allotment, and this Court is without authority to order the reduction of

elk.  Therefore, the SGA's "Fifth Claim for Relief" must be dismissed.

## VI.    Conclusion

      This Court concludes that the Forest Service and FWS violated the ESA's consultation

requirement and that the Forest Service violated the NFMA's consistency requirement.  In regard

to the SGA's appeal, this Court determines that the SGA's challenge to the alleged exclusion of

the Dry and Davis Allotments from the Sacramento Allotment is moot, and that the SGA's appeal

from the Forest Service's decision prohibiting the SGA from grazing the Dry and Davis

Allotments until the completion of the NEPA analysis is unripe for judicial review.  Additionally,

this Court affirms the Forest Service's three decisions to reduce the number of cattle allowed to

graze on the Sacramento Allotment, and rejects the SGA's request to order a reduction in elk

numbers on the Sacramento Allotment.

IT IS THEREFORE ORDERED that:

1.      The Forest Service and Fish and Wildlife Service violated the consultation requirement under Section 7 of the Endangered Species Act by failing to consult fully regarding the effects on the Mexican Spotted Owl from the issuance of the 1999 grazing permit for the Sacramento Allotment.

2.      The Forest Service and Fish and Wildlife Service must engage in Section 7 consultation on the issuance of the 1999 grazing permit for the Sacramento Allotment.

3.      The Forest Service violated the National Forest Management Act by failing to ensure that livestock grazing under the 1999 grazing permit for the Sacramento Allotment is consistent with the Lincoln National Forest Plan and with the 1996 Amendment to the Lincoln National Forest Plan.

4.      The Forest Service must modify the 1999 term grazing permit for the Sacramento Allotment in order to make the permit consistent with the Lincoln National Forest Plan and the 1996 Amendment to the Lincoln National Forest Plan.

5.      Forest Guardians' request that all grazing on the Sacramento Allotment be enjoined pending compliance with the Endangered Species Act and the National Forest Management Act is DENIED.

6.      The Sacramento Grazing Association's Motion for Summary Judgment (Doc. No. 127) is DENIED.

7.      The Sacramento Grazing Association's appeal from the Forest Service's alleged decision to exclude the Dry and Davis Allotments from the Sacramento Allotment is moot.

8.      The Sacramento Grazing Association's appeal from the Forest Service's decision prohibiting the Sacramento Grazing Association from grazing the Dry and Davis Allotments until the completion of the National Environmental Policy Act analysis is unripe for judicial review.

9.      The Forest Service's May 8, 2000 and August 2, 2000 orders to reduce the Sacramento Grazing Association's herd by 125-head and 98-head are AFFIRMED.

10.     The Forest Service's September 8, 2000 order to reduce the Sacramento Grazing Association's herd by 40% based on the Sacramento Grazing Association's permit violation is AFFIRMED.

11.     The Sacramento Grazing Association's request that this Court order the reduction in elk on the Sacramento Allotment is DENIED.

12.     The Sacramento Grazing Association's first, second, fourth, and fifth claims for relief are dismissed with prejudice.

13.     Final Judgments will be entered contemporaneously with the entry of this Memorandum Opinion and Order.

_____
CHIEF UNITED STATES DISTRICT JUDGE