## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FOREST GUARDIANS,

     Plaintiff,

v.                           No. CV 00-490 JP/RHS-ACE and

UNITED STATES FOREST SERVICE, et al.,

     Defendants.

_____

SACRAMENTO GRAZING ASSOCIATION,

     Plaintiff,

v.                           No. CV 00-1240 JP/RHS-ACE

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,                     (Consolidated)

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On October 18, 2001 Intervenors Roy Holcomb, Grant Myers, Randy Elkins, Calvin

Bishop, Kim and Rick Lessentine, and Sam Fairchild ("Intervenors") filed a Motion for Award of

Attorneys' Fees, Non-Taxable Expenses and Costs (Doc. No. 166), seeking to recover their fees

and costs from Plaintiff.[1]  On August 8, 2002 Plaintiff Forest Guardians filed a Petition for an

Award of Attorneys' Fees and Costs (Doc. No. 256), seeking to recover its fees and costs from

_____

[1] All matters addressed in this Memorandum Opinion and Order pertain to CV 00-490.

the Federal Defendants.[2]  On December 12, 2002 the Clerk entered an Order Settling Costs as between Plaintiff and Federal Defendants (Doc. No. 278).  Both Plaintiffs and Federal Defendants filed Objections to the Clerk's Order Settling Costs (Doc. Nos. 280 and 279).  This Court has carefully reviewed the pleadings, the exhibits of record, the arguments of counsel, and the relevant caselaw.  The Court concludes that Plaintiff's Petition for an Award of Attorneys' Fees should be GRANTED, in part, that the Intervenors' Motion for an Award of Attorneys' Fees should be DENIED, that Plaintiff's Objection to the Clerk's Order Settling Costs should be SUSTAINED, and that the Objections of Federal Defendants to the Clerk's Order Settling Costs should be OVERRULED.

    *Background.*  The Complaint was filed on April 6, 2000, raising two claims under the Endangered Species Act ("ESA"), and one under the National Forest Management Act ("NFMA").  Plaintiff alleged that excessive livestock grazing on certain allotments in the Lincoln National Forest threatened two species listed under the Endangered Species Act ("ESA"), the Mexican spotted owl ("MSO") and the Sacramento prickly poppy.  The grazing allotments include the Sacramento allotment and seven others, Agua Chiquita, EK/North Bluewater, Hyatt, Perk, Piñon, Pumphouse, and Scott Able.[3]

    Intervenors are ranchers who hold the grazing permits for six of the seven non-

---

[2]  "Federal Defendants" are the United States Forest Service and the Secretary of the United States Department of Agriculture, an office currently held by Ann M. Veneman.

[3]  The Sacramento allotment permittee, the Sacramento Grazing Association ("SGA"), filed a separate complaint against the United States Department of Agriculture, the United States Forest Service, the New Mexico State Game Commission, and various agency officials, CV 00-1240; that case was consolidated with CV 00-490.

Sacramento allotments.[4]  All Intervenors own private property adjacent to their Lincoln National Forest allotments.  The Court issued a Memorandum Opinion and Order on September 1, 2000 allowing these Intervenors to intervene as of right under FED. R. CIV. P. 24(a).

Plaintiff's First Cause of Action concerns only the Sacramento allotment.[5]  The Second Cause of Action alleged that the Forest Service was violating the ESA by failing to request formal Section 7 consultation on the impacts of grazing on the seven non-Sacramento allotments, despite documented overgrazing on those allotments.  The Forest Service had issued Biological Assessments ("BAs") for each allotment in April 1998 in which it had determined that its actions were "not likely to adversely affect" the listed species, and the United States Fish and Wildlife Service ("FWS") had concurred with those determinations.  Plaintiff asserted that in making their determinations, the Federal Defendants had incorrectly assumed that forage utilization standards for the allotments would not be exceeded when, in fact, those standards had been significantly exceeded for a number of years.  Plaintiff claimed that new monitoring information showing excessive forage utilization undermined the agencies' determinations and required the Forest Service and the FWS to engage in formal consultations for each allotment.

In the Third Cause of Action, Plaintiff alleged a violation of the NFMA in that overgrazing on the Sacramento allotment and on three of the non-Sacramento allotments (Agua Chiquita, EK/North Bluewater, and Piñon) was inconsistent with the Lincoln National Forest Plan, which

---

[4]  The permit holders for the allotments are as follows:  Roy Holcomb - Agua Chiquita; Grant Myers - EK/North Bluewater; Randy Elkins - Perk; Rick Munsey - Piñon; Kim and Rick Lessentine - Pumphouse; and Sam Fairchild - Scott Able.  The permit holder for the Hyatt allotment has not intervened.

[5]  The merits of Forest Guardians' Complaint with respect to the Sacramento allotment in CV 00-490, and the merits of SGA's Complaint in CV 00-1240, are addressed in a Memorandum Opinion and Order filed April 14, 2003 (Doc. No. 285).

required that the Forest Service control livestock grazing to meet certain conditions.

In May 2000, a few weeks after this suit was filed, the Forest Service issued amended Annual Operating Instructions ("AOIs") in which it reduced the allowable number of cattle for the 2000 grazing season or shortened the grazing season for five of the non-Sacramento allotments.[6] After these reductions, Forest Service monitoring data compiled in the fall of 2000 showed that grazing on the non-Sacramento allotments did not violate the applicable grazing standards.  The reductions were made by the Forest Service in 2000 without initiating formal consultations with FWS under Section 7 of the ESA.  The 2001 AOIs carried forward the adjustments imposed in the amended 2000 AOIs.

In the fall of 2000 Forest Guardians initiated settlement discussions with the Forest Service.  These discussions included the Intervenors.  In early 2001 the Court ordered the parties to engage in what became a series of mandatory settlement conferences with a federal magistrate judge.  On July 17, 2001 the parties submitted to the Court a Joint Motion to Approve Stipulation of Settlement and Dismissal With Prejudice, and the Court approved the Stipulation of Settlement and Dismissal With Prejudice (Doc. No. 152) the following day.

The Stipulation of Settlement provides that the Forest Service in the coming years will, among other things, apply the forage utilization standards, numbers, and seasons of use for the allotments as set forth in the 2001 AOIs, which carried forward the improvements from the 2000

---

[6] On May 8, 2000 the number of cow/calf pairs allowed on the Piñon allotment was reduced from 375 to 250, Pl. Ex. 6; on May 15, 2000 the grazing season on the Pumphouse allotment was shortened by three weeks, Pl. Ex. 7; on May 8, 2000 the number of livestock on the Scott Able allotment was reduced from 100 to 70, Pl. Ex. 8; on the Perk allotment, the Forest Service reduced permitted numbers of livestock from 55 to 32 pending the completion of a water pipeline system, Pl. Ex. 9; and on May 15, 2000 the permitted number of livestock on the Hyatt allotment was reduced from 30 to 20, Pl. Ex. 10.

grazing season.  Stip. of Settlement ¶ 5.  The settlement does not prohibit the Forest Service from deviating from these provisions in the future, but the settlement provides that the agency may do so only if it explains any proposed changes to Forest Guardians in advance and in writing.  Id.

The Forest Service also agrees to increase its monitoring to assess forage utilization on the allotments.  Id. ¶¶ 3, 4.  Whereas the Forest Service in previous years had monitored the allotments only once a year, in the fall after grazing had ended, the settlement requires three monitoring visits a year -- before grazing begins, at the mid-point of the grazing season, and in the fall after grazing has ended.  Id. ¶ 3.  After the first monitoring visit, if the leaf length of key grass species is less than one inch, the entry of livestock will be delayed for that season, and the number of cattle and/or season of use may be amended for that year.  Id. ¶¶ 6, 7.  After the second monitoring visit, if the forage cover height is less than four inches, the AOIs may be amended or the Forest Service may take other actions as necessary to ensure that the forage utilization standards are met.  Id. ¶¶ 8, 9.  In the settlement, the Forest Service also agrees to invite Forest Guardians to attend all monitoring visits, to give Forest Guardians five days' advance notice of the visits, and to provide copies of the monitoring documentation to Forest Guardians within 15 days after each site visit.  Id. ¶ 4.

Additionally, the Forest Service agrees to assess the watershed condition and riparian conditions of several areas within the grazing allotments, to notify Forest Guardians of and invite it to attend these assessment visits, to provide maps of the watershed areas to be assessed, and to provide written documentation of the visits to Forest Guardians afterwards.  Id. ¶¶ 11, 13.  The Forest Service agrees to conduct these watershed assessments as soon as practicable, and at least in time to be used and considered in conducting NEPA analyses on the allotments.  Id. ¶ 11.

5

Also as part of the Stipulation of Settlement, the Second and Third Causes of Action were dismissed with prejudice with respect to the non-Sacramento allotments.  Id. ¶ 1.

### I.  Plaintiff's Petition for an Award of Attorneys' Fees.

Plaintiff Forest Guardians contends that it is entitled to an award of attorneys' fees and costs as a prevailing party under the citizen suit provision of the ESA for its ESA claim, and under the Equal Access to Justice Act ("EAJA") for its NFMA claim.  The ESA provides:

> The court . . . may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

16 U.S.C. § 1540(g)(4).   The EAJA provides:

> [A] court shall award to a prevailing party . . . fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action . . . including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

These statutes constitute limited exceptions to the American Rule against fee-shifting. *See* Forest Conservation Council v. Devlin, 994 F.2d 709, 713 (9th Cir. 1993).  The burden is on the applicant to establish entitlement to an award of fees.  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  Thus, Plaintiff must establish that an award of fees is appropriate under the ESA claim, and that it is a prevailing party under the NFMA claim.

A party is entitled to a fee award under the ESA only when the party achieves "some success on the merits" of its claims.  Ruckelshaus v. Sierra Club, 463 U.S. 680, 693 (1983).  It is not appropriate to award fees to a losing party, but it may be appropriate to award fees to a partially prevailing party "achieving *some success*, even if not major success."  Id. at 688 (emphasis in original).

In addition to winning a judgment on the merits, a party may be considered a "prevailing party" under the EAJA by being awarded some relief in a consent decree or in a judicially enforceable settlement agreement that materially changes the legal relationship between the parties.  *See* Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 603-04 (2001); Texas State Teachers Assn. v. Garland Indep. Sch. Dist, 489 U.S. 782, 792 (1989); Richard S. v. Dept. of Developmental Servs. of California, 317 F.3d 1080, 1088 (9th Cir. 2003).

To be considered a "prevailing party" under either statute, a party need not succeed fully on all issues, or on the central issue, or even obtain the primary relief sought.  Texas State Teachers, 489 U.S. at 788-92 (construing civil rights fee-shifting provision contained in 42 U.S.C. § 1988).  A party "has crossed the threshold to a fee award" when it "has succeeded on any significant issue in litigation which achieved some of the benefit the parties sought in bringing the suit."  Texas State Teachers, 489 U.S. at 791-92; Sinajini v. Bd. of Educ. of San Juan Sch. Dist., 233 F.3d 1236, 1240 (10th Cir. 2000); Collins v. Romer, 962 F.2d 1508, 1512 (10th Cir. 1992).  It is sufficient for a party to succeed "on any significant claim affording it some of the relief sought . . .."  Texas State Teachers, 489 U.S. at 791.  A plaintiff "must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant."

Id. at 792.  Only if a plaintiff achieves an "insignificant" or "purely technical or *de minimis*" victory will it fail to cross the threshold to a fee award.  Id.

Plaintiff argues that it is a prevailing party under both its ESA claim and its NFMA claim.[7] The parties disagree whether Plaintiff's lawsuit was a catalyst for the voluntary changes made by the Forest Service when it amended the 2000 AOIs by reducing herds or shortening the grazing season on several of the allotments, but they agree that it would be inappropriate to utilize the catalyst test to measure an award of fees because of the existence of the judicially-approved Stipulation of Settlement.  Where, as here, a judgment is "in effect . . . the catalyst test does not apply" to determine whether a party prevailed.  Sinajini, 233 F.3d at 1241.

Forest Guardians contends it is a prevailing party by virtue of the Court-approved Stipulation of Settlement.  Whether Plaintiff is a prevailing party hinges on whether the Court-approved and judicially enforceable Stipulation of Settlement alters the legal relationship of the parties.  Plaintiff argues that the Stipulation of Settlement alters the legal relationship of the

---

[7]  Plaintiff is not seeking fees as a catalyst for the voluntary changes made by the Forest Service in the AOIs shortly after this lawsuit was filed.  Under the catalyst theory, a plaintiff may be entitled to an award of fees where the defendant voluntarily changed its behavior as a result of the lawsuit.  In the Tenth Circuit the catalyst test has two parts.  The applicant must show:  (1) the lawsuit was "causally linked" to the relief obtained; and (2) that the "defendant's conduct in response to the lawsuit was required by law."  Center for Biological Diversity, 262 F.3d 1077, 1081 (10th Cir. 2001) (quotation omitted).

The United States Supreme Court recently eliminated the catalyst test as a basis for awarding attorneys' fees under fee-shifting statutes that expressly allow an award of fees only to a "prevailing party."  Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598 (2001).  Whether the catalyst test may be used to award fees under fee-shifting statutes like the ESA that allow the court to award fees to a party when "appropriate" remains an open question after Buckhannon.  The Tenth Circuit has twice avoided deciding the question.  See Center for Biological Diversity v. Norton, 262 F.3d at 1080 n.2 (assuming, without deciding, that party may be awarded attorneys' fees under ESA); Amigos Bravos v. EPA, __ F.3d __, 2003 WL 1736399, *3 (10th Cir. April 2, 2003) (not deciding whether Buckhannon eliminates catalyst test for award of fees under Clean Water Act).  Two other circuit courts, however, have confronted this issue head on, and both courts ruled that after Buckhannon, the catalyst test is still an appropriate basis for awarding attorneys' fees under fee-shifting statutes that allow an award of fees when "appropriate."  See Loggerhead Turtle v. County Council of Volusia County, Florida, 307 F.3d 1318, 1319 (11th Cir. 2002) ("Buckhannon's holding does not extend to the fee-shifting provision of the ESA"); Sierra Club v. EPA, 322 F.3d 718, 719 (D.C. Cir. 2003) (holding that Clean Air Act, unlike statutes that authorize fee awards only to prevailing parties, permits fee awards under catalyst theory).

parties by giving Plaintiff the enforceable right to participate in allotment monitoring and the legal

right to challenge a Forest Service failure to carry out that monitoring.  Plaintiff points to

evidence in the record that prior to the settlement, Forest Guardians was not included on

monitoring visits and was not routinely provided with monitoring reports.  *See* Depo. Newmon,

Pl. Ex. 11 at 34, 39-40.

Federal Defendants contend, on the other hand, that the Stipulation of Settlement cannot

form the basis for a fee award because it did not afford the relief sought by Plaintiff in the

Complaint under the ESA or the NFMA, does not indicate the Forest Service violated the law in

any way, does not restrict livestock grazing on any of the non-Sacramento allotments, and did not

otherwise materially alter the relationship between Plaintiff and the Federal Defendants.

The thrust of the Complaint is that overgrazing was occurring on the allotments where the

Forest Service issued grazing permits in the Lincoln Notional Forest, in violation of the ESA and

the NFMA.  Either as a result of the filing of the Complaint, or independently of the filing of the

Complaint, the Forest Service implemented certain changes which resulted in cessation of

overgrazing on these allotments in the year 2000.  After that, negotiations among the parties to

this lawsuit resulted in a Court-sanctioned settlement agreement.  The effect of the settlement

agreement is that the Forest Service must engage in a more rigorous monitoring program on the

allotments, and must give Plaintiff notice of and an opportunity to attend the monitoring visits and

to timely review the monitoring reports.  This participation by Plaintiff has the potential to give

the voluntary changes made by the Forest Service in 2000, such as herd cuts and shorter grazing

seasons, more permanency.  Participation by Plaintiff in a monitoring program designed to reveal

in advance that grazing standards may soon be violated is likely to encourage the agency to

9

prevent such violations.

It is true, as argued by Federal Defendants, that the settlement did not afford Plaintiff the specific relief it sought in its Complaint.  Plaintiff sought formal ESA consultation (Count II) because utilization levels had been exceeded, and an injunction against livestock grazing because of alleged inconsistencies with the Forest Plan under the NFMA (Count III).  The Court did not grant to Plaintiff those requests for relief.  It is also true that, because the claims were dismissed with prejudice, Plaintiff is barred from renewing its claims against these non-Sacramento allotments, even if Plaintiff believes that the Forest Service's management under the existing term grazing permits continues to violate the ESA or NFMA.  The settlement does not require the Forest Service to conduct formal consultations with the FWS, or to revise the term permits to make them consistent with the Lincoln National Forest Plan, and does not set in place any limits on numbers or season of use.  But Plaintiff asserts that its goals in the settlement were to make the herd reductions imposed by the Forest Service in 2000 more permanent and to improve the Forest Service's monitoring, and that it achieved these goals.

Plaintiff achieved a significant goal of the ESA in assuring that forage utilization standards are met by means of more thorough and effective monitoring.  The substantive goal of consultation is to ensure that federal actions do not have adverse effects on protected species.  Where overgrazing has occurred and been corrected, this goal can be met if necessary grazing restrictions are maintained, and if the forage standards continue to be met.

The fact that there are no findings of any legal violations is not consequential because it is rare to include a finding of illegality in a settlement agreement.  Rather, the more important point is that Plaintiff succeeded in gaining concessions from the Federal Defendants that materially alter

their legal relationship.  Requiring the Forest Service to conduct more frequent monitoring on the allotments, giving Plaintiff the right to prior notice of monitoring visits and of proposed changes in the AOIs, and requiring that Plaintiff be provided with timely written documentation of the results of the monitoring visits constitute a material alteration of the legal relationship between Forest Guardians and the Forest Service.  Increased monitoring by the Forest Service and more involvement by Plaintiff are likely to benefit the MSO because they are designed to ensure that forage utilization standards will be met.

The Court concludes that Plaintiff is a prevailing party for purposes of entitlement to a fee award.  Although Plaintiff's success is limited, it is not *de minimis*.  The significance of what was attained in the settlement was probably greater than the significance of the voluntary reductions made by the Forest Service in the AOIs.  The voluntary reductions, on the other hand, were not made on all the allotments, and the magnitude of some of the reductions is not great.  "There is no precise rule or formula for making these [fee] determinations."  Hensley, 461 U.S. at 436.  Having compared the Complaint and the Stipulation of Settlement, and having carefully considered the other pleadings, the exhibits of record, and the arguments of counsel, the Court believes that a reduction of 50% in the loadstar amount is appropriate based on Plaintiff's limited success.

*Was the Forest Service's Position Substantially Justified or do Special Circumstances Make an Award Unjust?*

The Federal Defendants argue that their position was "substantially justified," and that "special circumstances" existed that make an award of fees to Plaintiff "unjust" under § 2412(d)(1)(A) of the EAJA.  Although the Federal Defendants assert that "substantial justification" is a relevant consideration to this Court's review of whether an award of fees is

11

"appropriate" under the ESA, it points to no caselaw that supports this assertion, and the Court rejects this notion.

To defeat a prevailing party's fee request under the EAJA, it is the government's burden to establish substantial justification.  Weakley v. Bowen, 803 F.2d 575, 577 (10th Cir. 1986).  Substantial justification focuses on whether the government's position was justified in substance, to a degree that could satisfy a reasonable person.  Pierce v. Underwood, 487 U.S. 552, 565 (1988).

> The term means more than 'merely undeserving of sanctions for
> frivolousness.' . . . 'But a position can be justified even though it is
> not correct, and . . . it can be substantially (i.e., for the most part)
> justified if a reasonable person could think it correct, that is, if it has
> a reasonable basis in law and fact.'

Hadden v. Bowen, 851 F.2d 1266, 1267 (10th Cir. 1988) (quoting Pierce v. Underwood, 487 U.S. at 566 and n.2).  "The term 'position' includes the government's position both in the underlying agency action and during any subsequent litigation."  Hadden v. Bowen, 851 F.2d at 1267.

The Federal Defendants assert that both their pre-litigation and their litigation positions were substantially justified.  They argue that their litigation position was reasonable because the Forest Service's amendment of the 2000 AOIs occurred within weeks after the filing of the Complaint and brought forage utilization levels within acceptable limits by the fall of 2000.  Subsequent settlement negotiations led to an agreement prior to briefing on the merits, bringing relatively quick closure to the claims concerning the non-Sacramento allotments, with minimal judicial involvement.  Plaintiff does not respond to this argument.  The Court concludes that the litigation position of the Federal Defendants was substantially justified.

12

The Federal Defendants also contend that the Forest Service's pre-litigation position was reasonable. The basis for that contention is that the changes the Forest Service made in the amended 2000 AOIs allegedly were already in the works and had nothing to do with the filing of this lawsuit. An examination of the evidence, however, convinces this Court that the changes made by the Forest Service were prompted by the lawsuit.

The evidence presented by the Federal Defendants to show that the changes made in May 2000 were already contemplated prior to the lawsuit is not persuasive. It consists of the deposition testimony of two Forest Service officials, and a couple of written items contained in documents in the record. The two officials maintain that this lawsuit did not affect their decisions to amend the 2000 AOIs. Range Staff Officer Rick Newmon and former District Ranger Max Goodwin stated they believed that it was prudent to review early spring moisture conditions before the 2000 grazing season began prior to actually amending the 2000 AOIs. *See* Depo. Newmon at 56, 132; Depo. Goodwin at 65, 66. The written items are, first, language in the 2000 AOIs purportedly reminding the permittees that changes were in the offing, and second, an April 4, 2000 letter from the Forest Service District Ranger to the permittee for the Scott Able allotment.

The 2000 AOIs contain the following language:

> We may get sufficient moisture, but in the interim we are letting you know our concern and that we may need to work together to amend this annual operating plan if drought conditions persist.

Fed. Def. Ex. 12-18. However, that language appears to be boilerplate, as the exact same language had been included in a paragraph entitled "Drought Management Planning" in the 1999 AOIs, after which no changes were made in the numbers of cattle allowed to graze or in seasons

13

of use.  *See* Pl. Reply, Ex. 2.  The same language is even found in the amended 2000 AOIs.  *See*

Pl. Ex. 6 at 6, Ex. 7 at 4, Ex. 8 at 4, Ex. 9 at 2, etc.

Similarly, in the April 4, 2000 letter to the permittee for the Scott Able allotment, the

Forest Service District Manager for the Sacramento District refers to an annual grazing

application meeting at which the "high forage utilization levels" on the allotment were discussed

with the permittee, "along with some changes needed to bring them into compliance."  Fed. Def.

Resp., Ex. B at 1.  This general reference to unspecified changes does not amount to an intent to

make the changes that were eventually made.  Further, the letter is not in reference to changes in

the AOIs, but to changes in the 10-year Allotment Management Plan.

Plaintiff's evidence, on the other hand, strongly supports its contention that the changes

made in 2000 were prompted by this lawsuit.  Shortly after the lawsuit was filed, the Forest

Service sent letters to all the non-Sacramento allottees to arrange meetings at which the agency

and permittees could discuss "any mitigation measures that may be needed" to respond to the

lawsuit.  Pl. Ex. 21-24.  Meetings with the allottees were held soon thereafter, and the Forest

Service promptly amended the 2000 AOIs for those allotments.  Two permittees, including the

permittee for the Sacramento allotment, reported that in these meetings the Forest Service had

asked them to agree to herd cuts in order to fend off this lawsuit.  Pl. Ex. 25, 26.  This evidence

convinces the Court that the pre-litigation position of the Forest Service was not substantially

justified.

The Federal Defendants next argue that there are special circumstances to make an award

of fees unjust in this case because the Forest Service avoided a violation of the ESA or the NFMA

by amending the 2000 AOIs before the 2000 grazing season began, shortly after the filing of this

14

lawsuit.  The special circumstances exception "helps to ensure that the government can advance in good faith novel but credible interpretations of the law."  United States v. Winchester Municipal Utilities, 944 F.2d 301, 306 (6th Cir. 1991).  The exception also gives the court discretion to apply equitable considerations that might dictate that a fee award should not be made.  National Treasury Employees Union v. IRS, 735 F.3d 1277, 1278 (11th Cir. 1984).  Courts rarely invoke the special circumstances exception.  Taylor Group, Inc. v. Johnson, 919 F.Supp. 1545, 1549 (M.D. Ala. 1996).

The Federal Defendants cite Martin v. Heckler, 733 F.2d 1499, 1502 (11th Cir. 1984) for the proposition that "prompt action taken by the state and federal defendants to correct the administrative errors which necessitated the filing of the suit" constituted special circumstances sufficient to deny an award of attorney fees to the prevailing party.  However, that holding was reversed by the Eleventh Circuit, sitting en banc, in Martin v. Heckler, 773 F.2d 1145, 1150 (11th Cir. 1985) ("Defendants' . . . prompt remedial action do[es] not warrant a denial of fees under the special circumstances preclusion.") (citations omitted), abrogated in part on other grounds, Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782 (1989).  The Court finds no special circumstances in this case to make a fee award to Plaintiff unjust.

Even though the Court has found that the government's litigation position with respect to the NFMA claim was substantially justified, the fee award will not be reduced significantly based on this factor.  This is because no reduction is made for this factor on the ESA claim, and because of the intertwined nature of the ESA and NFMA claims.  The factual background for both claims was the same, and the claims were legally interrelated in that they each turned on the overstocking and overgrazing of the non-Sacramento allotments.  The Court believes an additional 5%

15

reduction is an appropriate adjustment to make to the lodestar figure to account for the substantial justification of the litigation position of the Forest Service under the EAJA on the NFMA claim.

*Amount of Fee Award.*  The inquiry into the amount of a fee award to a prevailing party begins with a lodestar figure, which is derived by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  After determining the lodestar figure, other factors may be applied to increase or decrease this figure.

Plaintiff seeks to recover for the work of four attorneys:  Robert Wiygul - 19.0 hours; Marie Kirk - 80.0 hours; James Angell - 201.6 hours (this includes his work on the fee request); and Steven Sugarman - 20.0 hours.  These claimed hours are supported by detailed time records that appear to have been made contemporaneously by each attorney.  Approximately 150 hours of attorney time were deleted from the fee request based on Mr. Angell's "independent billing judgment to determine whether any time spent on this case might not be properly chargeable to a paying client at full rates."  Pl. Ex. 20 ¶ 6 at 2-3.  Although the case settled before proceedings on the merits took place, counsel for Plaintiff had to prepare the case by gathering relevant documents regarding grazing on the allotments, researching potential legal claims, drafting and editing the 60-day notice letter, preparing the Complaint, and preparing for and taking part in the mandatory settlement proceedings before the federal magistrate judge.

Federal Defendants argue that the entries in the billing records are too vague and general to allow meaningful review of the activities billed.  They also contend that some of the time is excessive because it involves conferences among co-counsel.  Finally, they request that many hours spent in deposing two Forest Service officers for the attorneys' fees portion of the litigation

16

be disallowed because the focus of the depositions was on the catalyst theory.  The Court finds

Plaintiff's attorneys' billing records are sufficiently detailed, and the hours charged are not

excessive or duplicative.  Billing judgment has been exercised properly, eliminating from the fee

request approximately one-third of the time spent on the case.  Therefore, I find that the number

of hours requested for each attorney is reasonable.

Under the ESA fee request, Plaintiff claims a market hourly fee rate of $200 for Mr.

Wiygul, $190 for Mr. Sugarman, $180 for Mr. Angell, and $140 for Ms. Kirk.  The Federal

Defendants do not contest the reasonableness of these claimed market rates, and the Court finds

that these are reasonable hourly rates for the work of these attorneys.  Under the EAJA fee

request, Plaintiff suggests that it be compensated at the rate of $140 per hour for the work of all

four attorneys, which is less than the statutorily authorized fee.[8]  Plaintiff also suggests that in

order to deal with the difference between the hourly rates under the ESA and the EAJA, the rates

for each attorney should be averaged, which would yield a rate of $170 for Mr. Wiygul, $165 for

Mr. Sugarman, $160 for Mr. Angell, and $140 for Ms. Kirk.  The Federal Defendants do not

object to the concept of averaging the two rates for each attorney, but they do object to using the

same rate of $140 per hour for each attorney under the EAJA.  The Court, however, finds that

Plaintiff's suggested method of calculating the overall hourly rate for each attorney is reasonable,

in that it fairly accounts for the different levels of experience of each attorney.

---

[8]  The EAJA establishes an hourly rate of $125, 28 U.S.C. § 2412(d), to be adjusted upward to account for
increases in the cost of living from March 1996 when that rate was established.  Plaintiff's uncontested calculation
of the adjusted rate is $147.45 per hour, based on Consumer Price Index ("CPI") data from June 2002.  The
calculation based on the most recent CPI data from February 2003 yields a rate of $150.34 (188.1 divided by 156.4,
multiplied by $125).

17

The lodestar figure therefore is the numbers of hours requested multiplied by the hourly rates as suggested by Plaintiff.  That figure will be adjusted downward by 50% to account for Plaintiff's limited success on the merits, and by another 5% to account for the partial substantial justification of Defendants' position.

*Calculation of Fee Award.*

Robert Wiygul - 19.0 hours x $170 = $3230.00

Marie Kirk - 80.0 hours x $140 = $11,200.00

James Angell - 201.6 hours x $160 = $32,256.00

Steven Sugarman - 20.0 hours x $165 = $3300.00

Lodestar Figure:  $49,986.00

50% reduction for limited success factor:  -$24,993.00

5% reduction for substantial justification factor:  -$2499.30

Total Fee Award = $22,493.70

**II.  Objections to Clerk's Order Settling Costs.**  Plaintiff requested compensation for its costs of litigation in addition to its attorneys' fees.  On December 12, 2002 the Clerk's Order Settling Costs taxed against the Federal Defendants the costs for depositions, copying, long distance telephone calls, and fax charges.  The Clerk disallowed the costs for postage and delivery, and for attorney travel expenses.  The Federal Defendants filed Objections to the Clerk's Order Settling Costs in which they contend that Plaintiff is not entitled to any costs because it was not a prevailing party in the litigation, because the position of the Forest Service was substantially justified, and because any benefits Plaintiff obtained in the settlement agreement were *de minimis*.

They also object to the taxing of the cost of the depositions on the ground that the taking of the depositions was not reasonable because they were taken to support a "catalyst" theory, which Plaintiff concedes is not applicable in this case.

The Court has already ruled that Plaintiff was a prevailing party in the litigation and that the benefits obtained by Plaintiff in the settlement were not *de minimis*.  Further, even though the Court has found that the position of the Forest Service was substantially justified, in part, under the EAJA, that is not a reason to disallow (or even to reduce) allowable costs.  The Court also finds that the taking of the depositions was reasonable even though the thrust of much of the questioning was directed at what the Federal Defendants term the catalyst theory.  The Federal Defendants attempted to show the Forest Service's pre-litigation position was substantially justified because the Forest Service had already decided to make the voluntary changes it implemented right after the filing of the lawsuit.  The Court disagreed and sided with Plaintiff on this issue.  The depositions were reasonable and these costs should be allowed.  Therefore, Federal Defendants' Objections to the Clerk's Order Settling Costs will be overruled.

Plaintiff also filed an Objection to Clerk's Order on Costs, in which it objects to the Clerk's disallowance of travel expenses in the amount of $2,968.82.  The Clerk disallowed these costs, stating:  "The Local Rules do not allow recovery of costs incurred by trial counsel for mileage and subsistence."  However, an attorney's travel expenses may be recovered under fee-shifting statutes such as the ESA.  *See* Bee v. Greaves, 910 F.2d 686, 690 (10th Cir. 1990) (allowing award of attorney's travel expenses under 42 U.S.C. § 1988); Sussman v. Patterson, 108 F.3d 1206, 1213 (10th Cir. 1997) (affirming award of mileage expense as part of fee award under § 1988); American Canoe Assn., Inc. v. EPA, 138 F. Supp.2d 722, 747 (E.D. Va. 2001)

19

(holding plaintiffs entitled to recover for counsel's travel expenses under ESA's citizen suit provision); Marbled Murrelet v. Pacific Lumber Co., 163 F.R.D. 308, 328 (N.D. Cal. 1995) (holding out-of-pocket expenses such as travel may be awarded as part of reasonable fee award under ESA). Travel expenses of counsel are normally billed to a client, and the costs submitted by Plaintiff are reasonable. Therefore, Plaintiff's Objection to Clerk's Order on Costs will be sustained.

### III. Intervenors' Motion for Award of Attorneys' Fees.

Intervenors seek to recover their fees from Plaintiff Forest Guardians. The first theory Intervenors assert is the "bad faith" exception to the American rule against awarding fees, recognized in Roadway Express, Inc. v. Piper, 447 U.S. 752, 766-67 (1980). A party acts in bad faith for purposes of this theory when the party's claim "is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Sterling Energy, Ltd. v. Friendly National Bank, 744 F.2d 1433, 1435 (10th Cir. 1984). "[T]he bad faith exception is drawn very narrowly and may be resorted to 'only in exceptional cases and for dominating reasons of justice.'" United States v. McCall, 235 F.3d 1211, 1216 (10th Cir. 2000) (quoting Sterling Energy, 744 F.2d at 1437). The Court has already found that Plaintiff is a prevailing party on both claims involving the non-Sacramento allotments. It follows that these claims are not entirely without color, thus negating Intervenors' bad faith theory. Intervenors also assert that the failure of Forest Guardians to name them as defendants in the lawsuit is further evidence of bad faith. This assertion is without any foundation or support in the law. Intervenors were not necessary parties under Rule 19 and Plaintiff was not obligated to join them.

Next, Intervenors argue that under Section 1540(g)(4) of the ESA the Court may award fees when "appropriate." They contend that an award against Forest Guardians is appropriate first because Plaintiff's claims are deficient. Intervenors argue that informal ESA consultation had already taken place, forage utilization standards were met in 2000, and the ESA claim could not apply to the Perk allotment because it had undergone a full NEPA analysis in 1998. Plaintiff counters that its claims were meritorious, and that no court has ever awarded fees against a plaintiff in an ESA case.[9]

The Court has already addressed at length the consultation issue in connection with the merits of the Sacramento allotment claims. *See* Mem. Op. & Ord. (Doc. No. 285) at 20-34. Also, as the foregoing discussion in section I of this Memorandum Opinion makes clear, at the time the Complaint was filed in April 2000, forage utilization standards were not being met. Forage utilization standards were not met until after the Forest Service amended the AOIs with reductions in numbers of cattle allowed to graze or in the season of use. The Forest Service monitoring data, indicating that overgrazing did not occur in 2000, were not collected until the fall of 2000, after a grazing season that incorporated herd reductions on several of the allotments.

Intervenors single out the Perk allotment as one that was inappropriately included in the lawsuit. Intervenors assert that no ESA consultation was required for the Perk because its 10-year permit was issued after a full NEPA analysis in 1998. Yet Intervenors cite no legal authority

---

[9] In their reply brief, Intervenors cite <u>Southwest Center for Biological Diversity v. United States Forest Service, et al.</u>, CIV 980367 TUC ACM (D. Ariz. 2000) as an ESA case in which fees were awarded to a rancher because of the bad faith of the environmental plaintiff. However, the fee award in that case was not made under Section 1540(g)(4) of the ESA, but rather under the bad faith exception to the American Rule. It is also significant that the fee award in that case was reversed by the Ninth Circuit, not only because the district court had failed to make sufficient findings of bad faith, but also because the appellate court's own review of the record did not reveal conduct rising to the level of bad faith. <u>Southwest Center for Biological Diversity v. McGee</u>, 2002 WL 460119, *1, 31 Fed. Appx. 362, 364 (9th Cir. Feb. 15, 2002) (unpublished).

whatever for the notion that compliance with NEPA provides an exemption from compliance with the consultation requirement of the ESA.  To the contrary, ESA regulations provide:

> Coordination with other environmental reviews.
> a) Consultation, conference, and biological assessment procedures under section 7 may be consolidated with interagency cooperation procedures required by other statutes, such as the National Environmental Policy Act (NEPA) . . .. *Satisfying the requirements of these other statutes, however, does not in itself relieve a Federal agency of its obligations to comply with the procedures set forth in this Part or the substantive requirements of section 7. . . .*

50 C.F.R. § 402.06(a) (emphasis added).

Intervenors argue that Count III, the NFMA count, had no validity because the Forest Service did not have to, and in fact was enjoined from, implementing the utilization table in the Forest Plan's 1995 amendment by a federal district court in Arizona.  This argument has been discussed at length and discredited in the Court's previous Memorandum Opinion and Order on the merits of the case involving the Sacramento allotment.  *See* Mem. Op. & Ord. (Doc. No. 285) at 35-38.

Intervenors also assert that an award of fees against Forest Guardians is appropriate under the ESA because Forest Guardians allegedly has attempted to create economic dislocation by overzealously pursing extremist environmental objectives.  Intervenors' Exhibit A is a copy of a newspaper article from the <u>Alamogordo Daily News</u> in Alamogordo, New Mexico that quotes a biologist "with Forest Guardians" as saying, "The Lincoln is really just the first step in what we hope to shut down grazing throughout the west."  This exhibit, of course, is inadmissible hearsay. Even if it were admissible, it would not support an award of fees against Forest Guardians. Intervenors attach as Exhibit B a copy of a cover of the Fall 2000 edition of <u>GreenRoots</u>, a Forest

Guardians newsletter containing the beginning of an article entitled "Behind the Cow Curtain," which states:

> Monstrous myth is what keeps Americans from seeing clearly the vast destruction that corporate cowboys have wreaked on the arid West. Seldom in history have so many been so deluded by so few. As agents of destruction, nuclear weapons may be the cow's only rival. To help see through the imagery and fabrication that maintains welfare ranching, this issue of GREENROOTS brings you the truth about how corporate cowboys have trampled our public lands into polluted wastelands.

This passage may contain exaggerated rhetoric,[10] but it does not come close to establishing the appropriateness of an award of fees against Plaintiff under the ESA.

The final statutory ground upon which Intervenors seek an award of fees is 28 U.S.C. § 1927, which provides:

> Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

An attorney's actions are deemed unreasonable and vexatious when the attorney acts in bad faith and multiplies the proceedings. <u>Dreiling v. Peugeot Motors of America, Inc.</u>, 768 F.2d 1159, 1165 (10th Cir. 1985). A court's power to assess fees and costs against an attorney personally under this section is one that must be utilized only in instances evidencing an attorney's serious and repeated disregard for the orderly process of justice. <u>Id.</u> There is no evidence to support such an award in this case. Plaintiff's claims had a factual basis at the time the Complaint was filed. After monitoring showed that overgrazing had not occurred on the non-Sacramento allotments during the 2000 grazing season, counsel for Plaintiff engaged in settlement negotiations

---

[10] Hyperbole also abounds in the briefs filed by Intervenors in this case.

that ended in a settlement of the claims.  There has been no multiplication of proceedings by counsel for Plaintiff; rather, Plaintiff's counsel's actions have been entirely proper in this case.


     THEREFORE IT IS ORDERED

     1.  Plaintiff's Petition for an Award of Attorneys' Fees (Doc. No. 256) is GRANTED to the extent that Plaintiff is awarded attorneys' fees against the Federal Defendants totaling $22,493.70;

     2.  Federal Defendants' Objections to the Clerk's Order Settling Costs (Doc. No. 279) are hereby OVERRULED;

     3.  Plaintiff's Objection to Clerk's Order on Costs (Doc. No. 280) is hereby SUSTAINED in that Plaintiff's counsel's travel expenses in the amount of $2,968.82 are taxed against Federal Defendants and are hereby awarded to Plaintiff;

     4.  Intervenors' Motion for Award of Attorneys' Fees (Doc. No. 166) is hereby DENIED.


_____

CHIEF UNITED STATES DISTRICT JUDGE